[No. F061058. Fifth Dist. Aug. 21, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
ROGER WAYNE ROBERTSON, Defendant and Appellant.

## Counsel

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Jamie A. Scheidegger, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**LEVY, Acting P. J.—**

## INTRODUCTION

On October 12, 2009,[1] appellant Roger Wayne Robertson kidnapped and sexually assaulted M.H. (the victim). He was convicted after jury trial of aggravated kidnapping for the purpose of committing rape (count 1), sexual penetration by a foreign object (count 2) and forcible rape (count 3). (Pen. Code, §§ 209, subd. (b)(1), 289, subd. (a)(1), 261, subd. (a)(2).)[2] The jury

---

[1] Unless otherwise specified, all dates refer to 2009.

[2] Unless otherwise specified all statutory references are to the Penal Code.

found true a special finding attached to counts 2 and 3 that appellant kidnapped the victim "in violation of Penal Code Section 207 or 209, pursuant to Penal Code Section 667.61(e)(1)" (special finding No. 2). (§ 667.61, subd. (e)(1).) The jury acquitted appellant of a second forcible rape count and of dissuading a witness from reporting a crime (counts 4 and 5). (§§ 261, subd. (a)(2), 136.1, subd. (b)(1).) The jury found not true a special finding that appellant kidnapped the victim, "and the movement of the victim substantially increased the risk of harm to the victim over and above that level of the risk necessarily inherent in the underlying offense in Penal Code Section 667.61, subdivision (c), pursuant to Penal Code Section 667.61(d)(2)" (special finding No. 1).

Appellant was sentenced on counts 2 and 3 to two consecutive terms of 15 years to life; a term of seven years to life was imposed and stayed on count 1. At the prosecutor's request, the court ordered that "defendant will have no contact whatsoever with the victim of his crimes."

Appellant challenges the sufficiency of the evidence supporting the aggravated kidnapping conviction and special finding No. 2, arguing that the People failed to prove appellant's movement of the victim substantially increased the risk of harm. We will explain that section 209, subdivision (b)(2) requires the People to prove that the movement of the victim was more than incidental and increased the risk of harm above that inherent in the enumerated sexual offense itself. Yet, section 209, subdivision (b)(2) does *not* require the People to prove that the movement *substantially* increased the risk of harm. Here, the record contains substantial evidence from which a rational trier of fact could find beyond a reasonable doubt that appellant's forcible movement of the victim away from the back of the garage by a door to the front of the garage near a large tub filled with water was more than incidental and increased the risk of physical and psychological harm to the victim.

Next, appellant argues that evidence of his prior sexual misconduct, which occurred in 1974, should have been excluded on the ground of remoteness. We reject this argument because the striking similarities between the prior sexual misconduct and the current crimes balance out the remoteness. This evidence was highly probative and was properly admitted pursuant to Evidence Code section 1108, subdivision (a).

Finally, appellant argues that the no-contact order is unauthorized; respondent concedes this point. The concession will be accepted as properly made because the no-contact order was not authorized by any statute and was not supported by a factual basis. We will strike the protective order and affirm the judgment in all other respects.

## GENERAL FACTUAL OVERVIEW

I. *Prosecution Evidence.*

In fall of 2009, appellant and his wife lived on a parcel of land containing a house, a detached garage, a workshop, a patio and dining area, a kennel, an aviary and several small outbuildings (the compound). Appellant conducted Christian services inside the garage, which was outfitted with several rows of pews, a pulpit and a large rectangular wooden tub which resembled a coffin. This tub was lined with black plastic and filled with water. It had a removable cover, which a photographic exhibit depicted as resting against an interior wall.

### A. *The victim's testimony.*

The victim is a native of Mexico who cannot speak English. She has four children, including a daughter who suffers from diabetes and an adult son named Miguel.

The victim attended three services conducted by appellant because several people told her that "[h]e worked miracles so I went there to have my daughter healed." Appellant told the victim "that he could heal [her] daughter" and asked the victim to bring the girl to see him. They made arrangements for appellant to meet her daughter sometime in October.

Appellant told the victim "that God told him" that her son should baptize her. So, during the victim's second visit to the compound, appellant directed the victim's minor son in baptizing the victim in the tub. During this baptism, the victim was fully submerged in the tub. The victim participated because she "wanted to have him heal [her] daughter."

The victim believed appellant was endowed by God with special healing powers that enabled him to work miracles. During the victim's baptism, appellant pulled out a towel that he said was covered in the blood of Christ. She heard appellant claim to have turned a snake into a lizard. The victim also believed appellant had the power to have someone harmed if he wanted to do so. Appellant told the victim that he had friends who were police officers in Atwater and they would hurt or kill any person he wished to be harmed. Appellant told the victim that his dogs would tear someone apart if he commanded them to do so.

During the morning of October 12, appellant called the victim. The victim could not understand appellant but thought that he was asking her to clean his home or the garage. She handed the phone to Miguel. After speaking with

appellant, Miguel asked the victim if she was willing to go to the compound and clean. The victim agreed.

About half an hour later, she and Miguel drove to the compound. Appellant was waiting for them in the parking area. He told Miguel to go look for a job. When Miguel told appellant that he did not have a car, appellant told him to take his mother's truck. Miguel responded that he did not have a driver's license. Appellant gave him a vacuum and told him to clean the cabins. When appellant was alone with the victim, he said, "Why did you bring your son? I did not want your son. I wanted you alone." The victim was uncomfortable with appellant's demeanor, which she characterized as "aggressive."

Appellant walked toward the garage and told the victim to follow him. Appellant did not take any cleaning materials with him. Appellant used a key to unlock the door at the back of the garage. He ordered her to go inside. The victim was afraid because the lights were off and the inside of the building was dark, but she obeyed him. Appellant followed her into the garage and locked the door with a key. Then he hugged her from behind. She pushed him away and tried to get to the door. The victim told appellant that she wanted to talk to his wife. He mockingly replied in Spanish that his wife was not here. He told the victim to walk toward the front of the garage where the pulpit and tub were located. When the victim refused, appellant put his arms on her back and pushed her forward past two rows of pews "[t]oward where the [tub] is." Appellant was "upset, furious." Again, he ordered her to walk forward. The victim obeyed because she "was afraid." The victim repeatedly asked appellant where his wife was and he replied in Spanish that she "is not here."

They stopped at the front of the garage near the tub. Appellant told the victim to take off her clothes and to lie on the ground. The victim initially refused but eventually lay down on the ground and took off her pants. Appellant lowered his pants. He held the victim with one hand, lifted the other hand in the air and, "in a mocking way," prayed, "Thank you Jesus for giving me a pretty woman. What I was asking you for, the prettiest woman." Appellant kissed the victim's mouth and neck. He slightly penetrated the victim's vagina with his penis at least two times. He was not able to maintain an erection so he inserted his fingers deep into her vagina.

The victim was frightened and angry but did not scream or struggle for several reasons. Appellant sexually assaulted her near the tub, which was uncovered and filled with water. The victim was afraid that if she resisted, appellant would throw her in the tub and drown her. Also, the victim was afraid that if Miguel heard her scream and came inside the garage, appellant would hurt Miguel or Miguel would hurt appellant. Finally, the victim was afraid of appellant's dogs and thought they would hurt her.

After 10 or 15 minutes, appellant and the victim heard Miguel approaching with the vacuum cleaner. Appellant pulled up his pants and the victim put her pants on. They exited the garage through the back door. Appellant told the victim to walk into the house and go to his wife's bedroom. The victim complied because she was afraid. Once they both were inside the bedroom, appellant told her to lie on the bed. She refused. Just then, Miguel opened the sliding door into the house. Appellant left the bedroom and the victim followed.

When the victim saw Miguel she did not tell him what appellant had done to her because she was worried that Miguel would try to hurt appellant. Instead, she told Miguel to tell appellant that they had to leave. He asked her what he should tell appellant and she told him to tell appellant that they had to pick up her other son from school. In order to prevent Miguel from suspecting what appellant had done to her, the victim told Miguel to ask appellant to give her a broom to sweep outside. The victim went to her truck and waited for Miguel. Appellant gave Miguel some packaged food that had passed its expiration date to take with them. Appellant went to the parking lot and prayed for them before they left.

Appellant repeatedly called the victim later that day and on October 13. During these calls, he told her not to tell anyone what he had done. If the victim did not answer the house's landline, appellant would call her cell phone. If she did not answer the cell phone, within seconds he would call the landline. The victim was upset by these calls and stopped answering the phone.

About a week after the sexual assault, the victim met with some of appellant's friends at a Starbucks coffee shop. She told them "what the [appellant] had done to [her]." They did not believe her, even after she swore on a Bible.

### B.   *Other prosecution evidence.*

On October 13, the victim and her friend Sonia Gutierrez went to the Merced Police Department to file a police report. The victim was referred to the Mariposa County Sheriff's Office, where she filed a report on October 14. Gutierrez acted as the victim's interpreter during the conversation with a police officer on October 14. Gutierrez testified that she tried to relay the information accurately but may have made some misstatements. The victim also spoke with a police officer on January 26, 2010; a certified interpreter and victim advocate were present during that interview.

A police officer who spoke with the victim on October 13 testified that when he "initially made contact with her she appeared nervous, embarrassed,

and . . . [y]ou could tell by her demeanor she was really embarrassed and . . . was a victim of something that did occur."

The victim made some pretext phone calls to appellant in the presence of a police officer.[3] During the first call, appellant exhorted her "don't tell nobody, Amen." During another call, the victim told appellant that she was not happy and said that Jesus did not like him. Appellant replied, "Yeah, he forgive," and, "I told Jesus sorry, he say forgive." The victim asked appellant to confirm that he would not touch her anymore. Appellant replied, "Okay. Finished." During another call, appellant said, "Yeah. So, nobody know amen," and "Yeah, don't tell nobody, Amen."

T.N. testified about an incident that occurred in 1974 during which appellant kidnapped and raped her. Appellant was arrested and charged with kidnapping, rape and attempted oral copulation in connection with that sexual assault. He accepted a negotiated plea agreement and pled no contest to one count of battery.

## II. *Defense Evidence.*

### A. *Appellant's testimony.*

Appellant testified that he began Christian ministry work in 1975. Some people think that he is a "kind of a miracle worker" who "can heal their children." But he "can't. Only God can." He knows that some women are sexually attracted "to preachers because they are preachers."

Appellant said his wife was away from the compound during the morning of October 12 and he expected his daughter and her children to visit him. While he was waiting, appellant called Miguel to ask why he had not attended the service that appellant conducted on Sunday and to see if Miguel was still planning to go to "a recovery home." Miguel "translated to his mother something." Then Miguel "asked . . . if my wife was there" and appellant "said no." Miguel asked appellant what he "was going to be doing," and appellant "said, what are you doing?" Miguel said they were "going to go to a work furlough place in Merced," and then said, "we're going to come and clean." Appellant replied, "I don't need you to come cleaning. Go get a job," and "hung the phone up."

About an hour later, Miguel and the victim arrived at the compound. Appellant was in his workshop when they approached him. The victim

---

[3] The pretext phone calls were recorded on audio CD's, which were played for the jury and admitted into evidence. A written transcript of the phone calls was provided to the jury for reference during trial; it was stipulated that the transcript was an accurate translation of the audio recording.

hugged appellant in an "inappropriate" way. Miguel asked appellant if he could vacuum the outbuildings and the victim asked if she could clean the garage. Appellant allowed them to stay and clean because "[p]eople come there all of the time. We eat. They clean. I don't stop them. That is their choice" to volunteer at the compound.

Appellant walked to the garage and the victim followed him. He entered the building through the back door, which was not locked. The victim followed him inside and shut the door. It was not dark inside the building because daylight entered through three windows. Nonetheless, appellant turned to switch on the lights. Suddenly, the victim grabbed appellant's penis over his pants. Appellant told her to stop, but she grabbed his penis again. Appellant removed the victim's hand and asked her to pray with him. He walked forward toward the front of the garage "to have her sit down and pray." The tub was at the front of the building; it was empty. The victim followed appellant and grabbed his crotch again. Appellant knew it "wasn't an accident" "[b]ecause this time she held on." He removed her hand. Appellant told her to "sit down there and pray and stop it." Appellant sat down on a pew and prayed to God for help. Then appellant "went to the other side to the front door," and opened the door. He turned around and saw that the victim was removing her clothing. Appellant left the garage. The victim chased him, grabbed his arm and held onto it.

Appellant saw Miguel and told him to take the victim home. Miguel replied that they came to work. Then Miguel said, "[s]he wants a broom to sweep out front." Appellant got a broom from the kitchen area, gave it to Miguel and went to his workshop. About five or 10 minutes later, the victim and Miguel approached appellant. Miguel told him that they were leaving. Appellant "prayed with them and [the victim] wanted to hug me again, and I told her not to come back." Miguel took some chips and food and then he and the victim drove away.

Appellant called Miguel later that day and left a message. The victim called appellant numerous times during the next few days and he returned her phone calls. During the pretext phone calls he was merely explaining the Bible to the victim.

Appellant denied sexually assaulting T.N. He pled no contest to battery on the advice of counsel and because he "was afraid." Appellant admitted having suffered a prior drug-related conviction as well as probation and parole violations. Appellant testified that he was delivered by God from drug addiction prior to serving a term at the California Rehabilitation Center.

B. *Other defense evidence.*

Darlene Lussier testified that she attended services at the compound and was meditating there during the morning of October 12. She observed a young Hispanic man and a Hispanic woman arrive in a vehicle. Appellant gave the man a vacuum. Later, she saw appellant and the woman coming from the garage. The woman had her arm on appellant's arm. Then Lussier saw the woman holding a broom. The woman conversed with the young man; they were laughing. Then she saw appellant praying with them. The woman gave appellant a hug and he backed away. Appellant gave them some food.

Appellant's daughter, Michelle Robertson, testified that appellant expected her and her children to visit on October 12. She had car trouble and did not visit as planned.

Robertson and Gonzalo Perez testified that appellant's dogs are not mean. Robertson characterized the dogs as "[p]retty loving," and said that her children "play with them all of the time." Sandra Alvarez testified that appellant's dogs "were mean, but he had them enclosed or locked up." Appellant told Alvarez to stay away from the dogs because one of them could not see.

Alvarez testified that she was present during the conversation with the victim at the Starbucks coffee shop. The victim said that she walked into the garage to clean when appellant followed her inside and closed the door. The victim said appellant "began to remove her clothing," and then he "began to touch her body parts, and . . . suck on her," and "lick[] her throughout her body."[4]

## DISCUSSION

I. *The Aggravated Kidnapping Conviction and Special Finding No. 2 Are Supported by Substantial Evidence.*

Appellant argues that his conviction in count 1 for aggravated kidnapping (§ 209, subd. (b)(1)) and the jury's true finding on special finding No. 2 (§ 667.61, subd. (e)(1)) must be reversed because the People failed to prove that his movement of the victim substantially increased the risk of harm to the victim above that necessarily present in the crime of rape. Respondent contends that subdivision (b)(2) of section 209 requires proof that the movement increased the risk of harm to the victim, but this increase is not

---

[4] The victim did not recall making these statements.

required to be substantial.[5] Respondent also argues that the record contains ample proof that appellant's movement of the victim was more than incidental and increased the risk of harm to the victim.

■ Respondent is correct. As we will explain, section 209 was amended in 1997 and, as amended, requires the People to prove that the movement ·of the victim was more than incidental and increased the risk of harm above that inherent in the enumerated sexual offense itself. Yet, section 209, subdivision (b)(2) does *not* require the People to prove that the movement *substantially* increased the risk of harm. Appellant's forcible movement of the victim away from the back of the garage by a door, past several rows of pews, to the front of the building near a large tub filled with water was more than incidental and increased the risk of physical and psychological harm to the victim over and above that necessarily present in rape or sexual penetration with a foreign object.

### A. Relevant statutory provisions.

The crime of simple kidnapping is contained in section 207. Subdivision (a) of section 207 provides: "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping."

The crime of aggravated kidnapping for the purpose of enumerated sexual offenses is contained in section 209, subdivisions (b) and (d). Subdivision (b)(1) of section 209 provides: "Any person who kidnaps or carries away any individual to commit robbery, rape, spousal rape, oral copulation, sodomy, or any violation of Section 264.1, 288, or 289, shall be punished by imprisonment in the state prison for life with the possibility of parole."

Subdivision (b)(2) of section 209 provides: "This subdivision shall only apply if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense."

Subdivision (d) of section 209 provides: "Subdivision (b) shall not be construed to supersede or affect Section 667.61. A person may be charged with a violation of subdivision (b) and Section 667.61. However, a person may not be punished under subdivision (b) and Section 667.61 for the same act that constitutes a violation of both subdivision (b) and Section 667.61."

---

[5] Respondent raised this argument in its written opposition to appellant's motion to dismiss the information. The trial court denied the dismissal motion without ruling on the point.

■ Subdivision 667.61, subdivision (e)(1) enhances the punishment to 15 years to life for the crimes of, inter alia, rape and sexual penetration with a foreign object where "the defendant kidnapped the victim of the present offense in violation of Section 207, 209, or 209.5." (§ 667.61, subd. (e)(1); see § 667.61, subds. (b), (c)(1), (5).)

B. *Section 209, subdivision (b)(2) does not require a substantial increase in the risk of harm.*

Appellant asserts that the asportation element of the crime of aggravated kidnapping requires proof that the movement of the victim *substantially* increased the risk of harm. He is incorrect. Although the asportation element requires the People to prove beyond a reasonable doubt that the movement of the victim increased the risk of harm above the risk inherent in the crime of rape, section 209, subdivision (b)(2) does not require the People to prove that this movement *substantially* increased the risk of harm.

Prior to 1990, the crime of aggravated kidnapping did not include kidnappings that were committed for the purpose of rape. "The crime of aggravated kidnapping was enlarged in 1990 to include kidnapping for enumerated sex crimes. (Stats. 1990, ch. 1560, § 1, p. 7329.)" (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1150 [47 Cal.Rptr.3d 575, 140 P.3d 866] (*Dominguez*).) To effectuate this change, the Legislature amended former section 208 to include kidnapping for the purpose of enumerated sex crimes. (Former § 208, subd. (d); see *Dominguez, supra*, 39 Cal.4th at p. 1150.)

In 1994, our Supreme Court decided *People v. Rayford* (1994) 9 Cal.4th 1 [36 Cal.Rptr.2d 317, 884 P.2d 1369] (*Rayford*), which held that the test for asportation previously announced in *People v. Daniels* (1969) 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225] (*Daniels*) also applied to aggravated kidnapping for the purpose of rape, as follows: "[T]he standard of asportation for [former] section 208(d) kidnapping requires that the movement of the victim be for a distance which is more than that which is merely incidental to the commission or attempted commission of rape . . . , and that this movement substantially increase the risk of harm to the victim over and above that necessarily present in the commission or attempted commission of these crimes." (*Rayford, supra*, 9 Cal.4th at p. 22; see *Dominguez, supra*, 39 Cal.4th at p. 1150.)

In 1997, the Legislature deleted subdivision (d) from section 208 and moved the crime of aggravated kidnapping for the purpose of rape to section 209. The Legislature rewrote subdivision (b) of section 209 and added subdivision (d). As part of its amendments, the Legislature divided subdivision (b) of section 209 into two parts. Subdivision (b)(2) of section 209 codifies

the asportation element required to commit the crime of aggravated kidnapping for the purpose of enumerated sexual crimes. As set forth above, subdivision (b)(2) provides: "This subdivision shall only apply if the movement of the victim is beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense."[6]

The Legislature's omission of the word "substantial" from subdivision (b)(2) of section 209 is both significant and intentional. Statutes 1997, chapter 817, section 17 provides: " 'It is the intent of the Legislature in enacting this act that the two-prong test of asportation for kidnapping, as set forth in People v. Daniels, 71 Cal.2d 1119, 1139 [80 Cal.Rptr. 897, 459 P.2d 225], be applied to violations of subdivision (b) of Section 209 of the Penal Code, *as amended by this act*, pursuant to the decision of the California Supreme Court in People v. Rayford, 9 Cal.4th 1, 20 [36 Cal.Rptr.2d 317, 884 P.2d 1369].' " (Historical and Statutory Notes, 47C West's Ann. Pen. Code, *supra*, foll. § 209, p. 51, italics added.)

Two California Supreme Court cases briefly addressed the effect of the Legislature's revision of section 209 on the asportation requirement that is an essential element of the crime of aggravated kidnapping for the purpose of enumerated sexual offenses. In *People v. Martinez* (1999) 20 Cal.4th 225 [83 Cal.Rptr.2d 533, 973 P.2d 512] (*Martinez*), the court wrote that the 1997 amendment of section 209 codified *Rayford, supra*, 9 Cal.4th 1, and a "modified version" of the asportation standard set forth in *Daniels, supra*, 71 Cal.2d 1119. (*Martinez, supra*, 20 Cal.4th at p. 232, fn. 4.) The court explained, "Unlike our decisional authority, it does *not* require that the movement 'substantially' increase the risk of harm to the victim." (*Ibid.*, italics added.) More recently, in *People v. Vines* (2011) 51 Cal.4th 830 [124 Cal.Rptr.3d 830, 251 P.3d 943] (*Vines*) the court stated that the 1997 revisions to section 209 "modified the asportation standard by eliminating the requirement that the movement of the victim 'substantially' increase the risk of harm to the victim." (*Vines, supra*, 51 Cal.4th at p. 869, fn. 20.) Yet, in both *Martinez* and *Vines* the court did not apply the modified asportation standard because the kidnappings at issue occurred before the effective date of the amendment. (*Vines, supra*, 51 Cal.4th at p. 840 [crimes committed in 1994]; *Martinez, supra*, 20 Cal.4th at p. 229 [crimes occurred prior to Mar. 21, 1995]; see, e.g., *Dominguez, supra*, 39 Cal.4th at pp. 1145, 1150, fn. 5 [crime occurred in Aug. 1997, predating amendment of § 209].)

---

[6] The Legislature made minor amendments in the language of section 209, subdivision (b)(1) in 2000 and 2006. Subdivision (b)(2) was not amended. The 2000 amendment of subdivision (b)(1) substituted "sexual penetration" for "rape by instrument" and the 2006 amendment of subdivision (b)(1) substituted "any violation of Section 264.1, 288, or 289" for "sexual penetration in violation of Section 289" and inserted "the" preceding "possibility of parole." (See Historical and Statutory Notes, 47C West's Ann. Pen. Code (2008 ed.) foll. § 209, p. 51.)

Several appellate decisions have acknowledged the Legislature's modification of the asportation standard. *People v. James* (2007) 148 Cal.App.4th 446 [55 Cal.Rptr.3d 767] recognized that section 209, subdivision (b)(2) codifies the *Daniels* rule, "except that it does not require that the movement 'substantially' increase the risk of harm to the victim." (*People v. James, supra*, 148 Cal.App.4th at p. 454, fn. 5; see *People v. Shadden* (2001) 93 Cal.App.4th 164, 168 [112 Cal.Rptr.2d 826] (*Shadden*).) *People v. Ortiz* (2002) 101 Cal.App.4th 410 [124 Cal.Rptr.2d 92] is particularly well reasoned. The appellate court concluded that, like aggravated kidnapping for the purpose of enumerated sexual offenses, kidnapping for the purpose of carjacking does not require a substantial increase in the risk of harm. (*Id.* at pp. 414–415.) It explained: "In 1997, the Legislature added to the aggravated kidnapping statute *Rayford*'s and *Daniels*'s requirement of an 'increase of risk of harm.' (See § 209, subd. (b)(2).) As the Supreme Court in *Martinez* noted, '[the aggravated kidnapping statute] thus codifies both *Rayford* . . . and a modified version of the *People v. Daniels* . . . asportation standard.' [Citation.] As such, the movement of the victim in an aggravated kidnapping must increase the risk of harm beyond that inherent to the underlying crime, but 'does not require that the movement "substantially" increase the risk of harm to the victim.' (*Ibid.*) When the Legislature added the risk of harm element to section 209, it tracked identical language employed four years earlier when it enacted the kidnapping for carjacking statute. [Citation.] It follows that the Legislature intended that the risk of harm element have the same meaning in both statutes, and it follows that the *Martinez* rule applies with equal force here. Accordingly, we hold that kidnapping for carjacking (§ 209.5), like aggravated kidnapping (§ 209), does not require that the physical movement of the victim *substantially* increase the risk of harm; it is enough that commission of the offense creates a risk of harm greater than that incidental to simple carjacking. And, indeed, that is what the statute states: 'This section shall only apply if the movement of the victim is beyond that merely incidental to the commission of the carjacking . . . and the movement of the victim increases the risk of harm to the victim over and above that necessarily present in the crime of carjacking itself.' [Citation.]" (*People v. Ortiz, supra*, 101 Cal.App.4th at pp. 414–415.)

In asserting that the increase in the risk of harm must be substantial, appellant errs by relying on California Supreme Court decisions applying the asportation standard that was in effect prior to the effective date of the 1997 amendment of section 209. (See, e.g., *Vines, supra*, 51 Cal.4th at pp. 840, 869 [crimes occurred in 1994]; *People v. Burney* (2009) 47 Cal.4th 203, 212 [97 Cal.Rptr.3d 348, 212 P.3d 639] [crimes occurred in 1992]; *Dominguez, supra*, 39 Cal.4th at p. 1150, fn. 5 [crimes occurred in 1997].)

We believe that *People v. Curry* (2007) 158 Cal.App.4th 766, 779 [70 Cal.Rptr.3d 257] (*Curry*), which appellant includes in a string citation, is not

persuasive authority with respect to the asportation standard. Without discussion, a panel of the Third District Court of Appeal accepted the defendant's assertion that the prosecution was required to prove that his movement of the victim "substantially increase[ed] the risk of harm to her." (*Id.* at p. 780.) The *Curry* decision did not set forth the applicable language of section 209, subdivision (b)(2) or cite *Martinez, supra,* 20 Cal.4th at page 232, footnote 4, which had been decided five years before *Curry. People v. Power* (2008) 159 Cal.App.4th 126 [70 Cal.Rptr.3d 799] (*Power*), which is cited by respondent, suffers from the same defect. Although the *Power* decision set forth the language of section 209, subdivision (b)(2), it did not recognize the import of the omission of the word "substantial," from that subdivision or discuss the conclusion in *Martinez* that the Legislature had modified the asportation standard contained in *Daniels, supra,* 71 Cal.2d 1119 when it amended section 209 in 1997. (*Power, supra,* 159 Cal.App.4th at pp. 137–139.) Also, neither *Curry* nor *Power* considered the decisions of their sister courts on this point: *People v. James, supra,* 148 Cal.App.4th at page 454, footnote 5, and *People v. Ortiz, supra,* 101 Cal.App.4th at pages 414–415. Since the *Curry* and *Power* decisions did not recognize the effect of the Legislature's 1997 amendment of section 209, we decline to follow these decisions with respect to the asportation element of the crime of aggravated kidnapping for the purpose of enumerated sexual offenses.

■ In sum, we hold that section 209, subdivision (b)(2) requires the People to prove beyond a reasonable doubt that appellant's movement of the victim was not merely incidental and that it increased the risk of harm to the victim over and above that which is inherent in the sexual offense itself. Yet, section 209, subdivision (b)(2) does not require proof that the movement *substantially* increased the risk of harm to the victim.

    C.   *The record contains substantial evidence proving that appellant's movement of the victim was not merely incidental to the rape and that it increased the risk of harm.*

We now turn to an assessment of the evidence proving the asportation element of aggravated kidnapping for the purpose of rape.

    1.  *Standard of review.*

When assessing a challenge to the sufficiency of the evidence, the reviewing court must decide whether the record contains substantial evidence such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) In applying this test, we review the entire record in the light most favorable to the judgment and presume in its support the existence

of every fact the trier could reasonably have deduced from the evidence. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].) "In deciding the sufficiency of the evidence, we ask whether, ' "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" (*Shadden, supra,* 93 Cal.App.4th at p. 168.)

### 2. Satisfying the asportation element requires proof of two interrelated prongs.

■ "For simple kidnapping (§ 207), the kidnapper's physical movement of the victim must be 'substantial in character'—the so-called asportation element. [Citations.] For aggravated kidnapping for . . . rape (§ 209), however, . . . the asportation element encompasses not only physical movement, but also the manner of the crime's execution." (*People v. Ortiz, supra,* 101 Cal.App.4th at p. 414.) The asportation element of aggravated kidnapping contains two interrelated prongs:

"Kidnapping to commit rape involves two prongs. First, the defendant must move the victim and this asportation must not be 'merely incidental to the [rape].' [Citations.] Second, the movement must increase 'the risk of harm to the victim over and above that necessarily present in the [rape].' [Citation.] The two are not mutually exclusive, they are interrelated. [Citation.]

"For the first prong, the jury considers the distance the defendant moved the victim and the 'scope and nature' of the movement. [Citations.] For the second, it considers whether the movement gave the defendant 'the decreased likelihood of detection' and an 'enhanced opportunity to commit additional crimes.' [Citation.]" (*Shadden, supra,* 93 Cal.App.4th at p. 168.)

■ In *Dominguez, supra,* 39 Cal.4th 1141, the Supreme Court explained, "[w]hether a forced movement of a rape victim . . . was merely incidental to the rape, and whether the movement . . . increased the risk of harm to the victim, is difficult to capture in a simple verbal formulation that would apply to all cases." (*Id.* at p. 1151.) The jury must consider the scope and nature of the movement and the context in which the movement occurred. (*Ibid.*) "This standard suggests a multifaceted, qualitative evaluation rather than a simple quantitative assessment. Moreover, whether the victim's forced movement was merely incidental to the rape is necessarily connected to whether it . . . increased the risk to the victim. 'These two aspects are not mutually exclusive, but interrelated.' [Citation.]" (*Id.* at p. 1152.) The *Dominguez* court continued: "The essence of aggravated kidnapping is the increase in the risk

of harm to the victim caused by the forced movement. [Citation.] We have articulated various circumstances the jury should consider, such as whether the movement decreases the likelihood of detection, increases the danger inherent in a victim's foreseeable attempts to escape, or enhances the attacker's opportunity to commit additional crimes. [Citation.]" (*Ibid.*) The appellate court must consider "how all the attendant circumstances relate[] to the ultimate question of increased risk of harm." (*Ibid.*) Although "the actual distance the victim was forced to move" is a "relevant factor," the Supreme Court has "repeatedly stated no minimum distance is required to satisfy the asportation requirement." (*Ibid.*) Actual distance "must be considered in context, including the nature of the crime and its environment. . . . [E]ach case must be considered in the context of the totality of its circumstances." (*Ibid.*)

Further, the increased risk may be of either physical or psychological harm. (*People v. Nguyen* (2000) 22 Cal.4th 872, 885–886 [95 Cal.Rptr.2d 178, 997 P.2d 493].) The word "harm" includes "mental suffering." (*Id.* at p. 885.) Also, "[t]he fact that the potential for serious injury inherent in such a situation is not actualized during the course of the asportation itself—and that injury occurs only after the asportation has ceased—is simply not relevant to the issue." (*People v. Lara* (1974) 12 Cal.3d 903, 908 [117 Cal.Rptr. 549, 528 P.2d 365], fn. omitted; see *Martinez, supra*, 20 Cal.4th at p. 233 [" 'The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased. [Citations.]' "].)

> 3. *Appellant's movement of the victim was not merely incidental to the rape and it increased the risk of physical and psychological harm.*

After carefully reviewing the record, we agree with respondent that appellant's movement of the victim from the back of the garage by a door to the front of the garage next to a large tub of water, was not merely incidental and increased the victim's risk of physical and psychological harm above the risk inherent in the crime of rape.

■ Appellant's movement of the victim was not merely incidental to the rape. "Where a defendant drags a victim to another place, and then attempts a rape, the jury may reasonably infer that the movement was neither part of nor necessary to the rape." (*Shadden, supra*, 93 Cal.App.4th at p. 169.) Here, the victim testified that immediately after she entered the garage appellant locked the door and began touching her. When she tried to escape, he overpowered her. Yet, he did not rape her at this location. Instead he locked the back door and pushed the victim past two rows of pews. Then he ordered her to continue walking forward until she was standing deep in the interior of the

building near the tub full of water. Only when she was as far away from the back door as possible and near the tub did he order her to undress and then raped her. Considering the particular circumstances of this crime, we conclude that appellant's movement of the victim to the front of the garage by the tub was substantial in character.

Appellant's movement of the victim served several purposes and increased the risk of harm. "[A] rape victim is certainly more at risk when concealed from public view and therefore more vulnerable to attack." (*People v. Hoard* (2002) 103 Cal.App.4th 599, 607 [126 Cal.Rptr.2d 855].) By moving the victim away from the back door, appellant reduced the possibility that the victim could escape. Even if she had been able to gain access to appellant's key, appellant increased the odds that he could foil an escape attempt by expanding the distance between the victim and the back door. The movement also decreased the likelihood of detection since it was less likely that Miguel could have heard his mother if she had screamed for help.

In addition, positioning the victim next to the tub of water increased the victim's fear. This helped appellant gain control over the victim and ensured her compliance with his demands. Appellant moved the victim to a place where he could quickly and quietly drown her if she resisted. When they were by the back door the victim resisted and tried to thwart appellant's attack. But once appellant forced the victim to the front of the building and near the tub of water, the victim ceased all resistance. The victim testified that she complied with appellant's sexual demands, in part, because she was afraid he would drown her. It was not necessary for appellant to expressly make such a threat; the threat was implicit in his movement of the victim next to the tub. Since the victim had been baptized in the tub by full immersion, she knew for a fact that the water was deep enough to submerge her and knew how it felt to be submerged under it. Under the circumstances presented here, it was objectively reasonable for the victim to fear being drowned if she resisted. The fact that appellant's movement of the victim next to the tub helped him gain control over her and ensure her compliance is further demonstrated by the fact that the victim submitted to rape when she was next to the tub. However, once she left the garage and entered his bedroom, she refused to submit to additional sexual acts.

Appellant's movement of the victim to the front of the garage next to the tub increased his opportunity to commit additional sexual crimes. He was in complete control of the victim, in a location where cries for help would not be easily heard and where the victim's son would be unlikely to see them. Appellant's positioning of the victim in a secluded place by a full tub of water increased his ability to perform multiple unwanted sex acts without resistance or interruption.

Finally, by moving the victim toward the pulpit and tub, appellant increased his psychological control over the victim. The victim believed appellant possessed extraordinary power that he could use to heal or to inflict harm. By moving the victim to the precise location where he preached, appellant magnified his psychological dominance over her. Appellant raped the victim at the same place where he presided over her baptism, increasing the risk of psychological harm.

We do not find the fact that the movement occurred within the confines of the garage to be dispositive. As previously explained, our Supreme Court has "repeatedly stated no minimum distance is required to satisfy the asportation requirement" and actual distance "must be considered in context, including the nature of the crime and its environment." (*Dominguez, supra*, 39 Cal.4th at p. 1152.) "Where movement changes the victim's environment, it does not have to be great in distance to be substantial." (*Shadden, supra*, 93 Cal.App.4th at pp. 169, 167–169 [dragging a store clerk nine feet from the front counter of a store to a small back room for the purpose of raping her was sufficient to support aggravated kidnapping conviction]; *People v. Smith* (1995) 33 Cal.App.4th 1586, 1594 [40 Cal.Rptr.2d 31] [moving victim 40 to 50 feet from driveway that could be viewed from the street into a camper at the rear of the house for the purpose of rape was sufficient to support aggravated kidnapping conviction]; *People v. Salazar* (1995) 33 Cal.App.4th 341, 348–349 [39 Cal.Rptr.2d 337] [movement of victim 29 feet from outside walkway to bathroom of motel room for the purpose of rape was sufficient to support aggravated kidnapping conviction].)

Appellant's reliance on cases involving movements of short distances where the kidnappings were committed for the purpose of robbery is misplaced. Kidnapping for the purpose of robbery is not analogous to kidnapping for the purpose of rape. *People v. Hoard, supra*, 103 Cal.App.4th 599 explained that rape victims are more vulnerable to attack and at greater risk when they are concealed from public view. Yet, in a robbery "the victims may have been at less risk tied up in the back office where they could not try to thwart the robbery than had they remained at gunpoint in the front of the store." (*Id.* at p. 607.)

For all of these reasons, we hold that the movement of the victim deep into the interior of the garage near the tub full of water dramatically changed the victim's environment by reducing her ability to escape, decreasing the likelihood of detection, and elevating the risk of serious injury or death. This movement enhanced the risk of physical and psychological harm. The record contains substantial evidence from which a reasonable trier of fact could conclude beyond a reasonable doubt that the movement was more than merely incidental and increased the risk of harm above and beyond that

inherent in the crime of rape. Therefore, we reject appellant's challenge to the sufficiency of the evidence and uphold the conviction in count 1 and the true finding on special finding No. 2.

>   D.   *The jury was correctly instructed on the asportation element of aggravated kidnapping.*

Respondent briefly raises a related instructional issue. CALCRIM No. 1203, "Kidnapping: For Robbery, Rape, or Other Sex Offenses (Pen. Code, § 209(b))" instructs that the People are required to prove, inter alia, that using "force or fear, the defendant moved the other person or made the other person move a substantial distance," and further instructs that to constitute substantial distance "[t]he movement must have *substantially* increased the risk of physical or psychological harm to the person beyond that necessarily present in the rape or sexual penetration." (Italics added.) Respondent argues that to the extent this instruction requires the People to prove a *substantial* increase in the risk of harm, it is inconsistent with subdivision (b)(2) of section 209. Respondent further argues that CALCRIM No. 3179 is erroneous in that it refers the jurors to the elements used in the jury instruction for kidnapping. Appellant expressly refused to respond to respondent's instructional arguments.

Respondent's argument is factually erroneous. Respondent only cited to the page of the clerk's transcript containing CALCRIM No. 1203. During the instructional conference, both parties and the court agreed to modify CALCRIM No. 1203. As part of this modification, the problematic word "substantial" was removed from the sentence discussing the increase in the risk of harm. The jury was instructed on this point as follows: "The move must have increased the risk of physical or psychological harm to the person present of the sexual penetration [*sic*]." This sentence is not substantively inconsistent with section 209, subdivision (b)(2) or the holdings of *Martinez* and *Vines*. (*Vines, supra*, 51 Cal.4th at p. 869, fn. 20; *Martinez, supra*, 20 Cal.4th at p. 232, fn. 4; see *People v. James, supra*, 148 Cal.App.4th at p. 454, fn. 5.) We decline to address an error that theoretically might have, but did not, occur because such discussion would be dicta. (See *People v. Vang* (2011) 52 Cal.4th 1038, 1047, fn. 3 [132 Cal.Rptr.3d 373, 262 P.3d 581].)

>   II.   *The Trial Court Properly Admitted Evidence of Appellant's Prior Sexual Misconduct.*

>     A.   *Facts.*

On July 6, 2010, the prosecutor filed a motion to admit evidence of uncharged sex offenses that appellant committed on T.N. In response, appellant filed a motion to exclude this evidence pursuant to Evidence Code section 352. The People opposed appellant's exclusion motion.

The motions were heard on July 22, 2010. At the outset, the parties and the court agreed that the "issues here lie in [Evidence Code sections] 1108 and 352."

After initial arguments by counsel, T.N. testified before the court. T.N. said she was 17 years old in February 1974. On February 17, 1994, she and Henry Hernandez were hitchhiking on Highway 1. Appellant was driving a "bigger car" that looked like a Cadillac. Appellant stopped and picked them up. After driving for a short distance, appellant asked if he could drop them off. Hernandez got out of the car. Before T.N. could exit the vehicle, appellant sped away. T.N. tried to grab the gearshift so she could escape from the car. Appellant punched her in the head "and told [her] he was going to kill [her] if [she] didn't do what he told [her] to do." Appellant parked the vehicle in an isolated field off Highway 1. Appellant told T.N. "if I did what he asked me to do then he wouldn't kill me." He raped her in the front seat. T.N. complied because she was afraid of appellant. Then appellant drove her to Grover City and let her go. T.N. went to Hernandez's parents' house and Hernandez's father took her to the police station. T.N. was interviewed for several hours by police officers who made her feel "like [she] was the criminal," and then taken to the hospital. Felony charges for kidnapping, rape and attempted oral copulation were filed against appellant. T.N. testified at the preliminary hearing. Appellant accepted a plea bargain whereby the information was amended to include a battery charge and appellant pled no contest to that offense.

After further argument by counsel, the court admitted evidence concerning the 1974 kidnapping and rape of T.N. The court explained its ruling, as follows:

". . . This is the Court's 352 analysis as to the probative value. The testimony certainly is probative for the reason set forth by the People in their moving papers, and based upon the testimony of [T.N.] It may, however, may not be as probative as believed by the People due to the fact that there is only one prior act of alleged conduct occurring in the past 35 years. However, I will address that later.

"The Court believes that the conduct is extremely similar rather than dissimilar. It is clear from the record that the alleged victim in the prior alleged matter is an independent source. As to the prejudicial impact, the Court does not believe that the jury would be prejudiced by any apparent inflammatory nature of the prior alleged offense or conduct.

"As to remoteness, certainly an alleged conduct occurring 35 years ago can be deemed to be remote. But then can be balanced out by the similarities of

the offenses. And these are the similarities that this Court finds. That the victim in the present case was allegedly summoned to the defendant's house or [garage] under false pretenses. In the prior conduct the defendant allegedly turned his car around to pick up the victim while they were hitchhiking. The victim in the present case was allegedly locked or placed in a closed building by the defendant. In the prior conduct the victim was kept in a car after having her other passenger, the other hitchhiker, step out and the defendant driving away. In the present case the victim was in fear of the defendant. That is set forth in the moving papers. And in the prior incident the victim allegedly told—was told by the defendant that she would be killed if she did anything. In both situations the defendant allegedly separated the victims from their companions that they were with at the time. As to the consumption of time, based upon the testimony of the prior alleged victim, the Court does not find that there would be an undue consumption of time by allowing this evidence in. The Court does not see any minitrial occurring based upon the testimony that I heard today.

"Therefore, the Court finds that the probative value of the evidence outweighs any prejudicial [e]ffect and grants the People's motion. The defendant's motion to exclude the evidence is denied."

T.N.'s trial testimony was consistent with the testimony she gave during the evidentiary hearing.

During appellant's testimony, he denied kidnapping or raping T.N. Appellant testified, "The first time I ever saw the accuser was in a court house in San Luis Obispo." Appellant said that he pled no contest to battery because he was scared and counsel advised him to accept the plea bargain.

The jury charge included CALCRIM No. 1191, which instructs on the use of evidence of prior sexual misconduct.

B. *The applicable statutory framework and standard of review.*

█ As a general rule, evidence of a defendant's prior conduct is inadmissible when offered by the opposing party to prove the defendant's conduct on a specific occasion, unless it involves the commission of a crime, civil wrong, or other act and is relevant to prove some fact (e.g., motive, intent, plan, identity) other than a disposition to commit such an act. (Evid. Code, § 1101, subds. (a), (b).) "In 1995, the Legislature enacted [Evidence Code] section 1108 to expand the admissibility of disposition or propensity evidence in sex offenses cases." (*People v. Falsetta* (1999) 21 Cal.4th 903, 911 [89 Cal.Rptr.2d 847, 986 P.2d 182] (*Falsetta*).) Evidence Code section 1108, subdivision (a) provides: "In a criminal action in which the defendant is accused of a sexual

offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to [Evidence Code] Section 352."

Evidence Code section 1108 "radically changed" the general rule prohibiting propensity evidence in "sex crime prosecutions." (*People v. Britt* (2002) 104 Cal.App.4th 500, 505 [128 Cal.Rptr.2d 290] (*Britt*).) "By removing the restriction on character evidence in [Evidence Code] section 1101, [Evidence Code] section 1108 now 'permit[s] the jury in sex offense . . . cases to consider evidence of prior offenses *for any relevant purpose*' [citation], subject only to the prejudicial effect versus probative value weighing process required by [Evidence Code] section 352." (*Ibid.*) Evidence of prior crimes is admissible, unless otherwise excluded by Evidence Code section 352, whenever it may be helpful to the jury on a commonsense basis, for resolution of any issue in the case, including the probability or improbability that the defendant has been falsely accused. (*Britt, supra*, at p. 506.)

By enacting Evidence Code section 1108 the Legislature intended, in the case of sex crimes, to sweep away the narrow categories of admissibility of other crimes evidence that had existed under Evidence Code section 1101. (*Britt, supra*, 104 Cal.App.4th at p. 505.) ". . . Evidence Code section 1108 authorizes the admission of evidence of a prior sexual offense to establish the defendant's propensity to commit a sexual offense, subject to exclusion under Evidence Code section 352." (*People v. Lewis* (2009) 46 Cal.4th 1255, 1286 [96 Cal.Rptr.3d 512, 210 P.3d 1119].) "[T]he Legislature's principal justification for adopting [Evidence Code] section 1108 was a practical one: By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations. [Evidence Code section] 1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes. [Citation.]" (*Falsetta, supra*, 21 Cal.4th at p. 915.)

■ When a party seeks to admit evidence of prior sex crimes pursuant to Evidence Code section 1108 the court must decide whether the evidence is "subject to exclusion" under Evidence Code section 352. (See Evid. Code, § 1108, subd. (a).) "To be admissible under Evidence Code section 1108, 'the probative value of the evidence of uncharged crimes "must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury." [Citations.]' [Citation.] 'The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense. Other factors affecting the probative value include the extent to

which the source of the evidence is independent of the charged offense, and the amount of time between the uncharged acts and the charged offense. The factors affecting the prejudicial effect of uncharged acts include whether the uncharged acts resulted in criminal convictions and whether the evidence of uncharged acts is stronger or more inflammatory than the evidence of the charged offenses.' [Citation.] 'The weighing process under [Evidence Code] section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules.' [Citation.]" (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274 [103 Cal.Rptr.3d 633].)

"A trial court 'may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' ([Evid. Code,] § 352.)" (*People v. Wesson* (2006) 138 Cal.App.4th 959, 969 [41 Cal.Rptr.3d 883].)

In arguing that it was error to admit T.N.'s testimony appellant relies heavily on *People v. Ewoldt* (1994) 7 Cal.4th 380, 404 [27 Cal.Rptr.2d 646, 867 P.2d 757] (*Ewoldt*), and its analysis under Evidence Code section 1101, subdivision (b) of the similarities between the uncharged and charged offenses. This is not the correct analytical framework. *Ewoldt* was decided before the Legislature adopted Evidence Code section 1108; *Ewoldt*'s holding on the admissibility of prior uncharged sexual misconduct was superseded by the enactment of Evidence Code section 1108. The similarity analysis of *Ewoldt* does not apply when evidence is admitted pursuant to Evidence Code section 1108. (*Britt, supra*, 104 Cal.App.4th at pp. 505–506.) The similarity between the charged crimes and the prior sexual misconduct is still a consideration but it plays a smaller role in the question of admissibility under Evidence Code section 1108 than it does under Evidence Code section 1101 because similarity is but one of many factors for the trial court to consider. (*People v. Frazier* (2001) 89 Cal.App.4th 30, 40–41 [107 Cal.Rptr.2d 100].)

A challenge to admission of prior sexual misconduct under Evidence Code sections 1108 and 352 is reviewed under the deferential abuse of discretion standard and will be reversed "only if the court's ruling was 'arbitrary, whimsical, or capricious as a matter of law. [Citation.]' [Citation.]" (*People v. Branch* (2001) 91 Cal.App.4th 274, 282 [109 Cal.Rptr.2d 870] (*Branch*).) "We review the correctness of the trial court's ruling at the time it was made, . . . and not by reference to evidence produced at a later date." (*People v. Welch* (1999) 20 Cal.4th 701, 739 [85 Cal.Rptr.2d 203, 976 P.2d 754].)

C. *Admission of testimony that appellant kidnapped and raped T.N. was not an abuse of discretion.*

█ When assessing the admissibility of evidence of prior sex crimes under Evidence Code section 1108, the trial court engages in a careful weighing process under Evidence Code section 352. "[T]rial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense. [Citations.]" (*Falsetta, supra,* 21 Cal.4th at p. 917.)

█ Appellant argues that the prior sexual assault, which occurred approximately 34 years before the current sexual offenses, was too remote to have probative value and should have been excluded for this reason. We disagree. "No specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible." (*Branch, supra,* 91 Cal.App.4th at p. 284.) " '[S]ubstantial similarities between the prior and the charged offenses balance out the remoteness of the prior offenses. [Citation.]' [Citation.]" (*People v. Pierce* (2002) 104 Cal.App.4th 893, 900 [128 Cal.Rptr.2d 397], quoting *Branch, supra,* 91 Cal.App.4th at p. 285.)

Numerous cases have upheld admission pursuant to Evidence Code section 1108 of prior sexual crimes that occurred decades before the current offenses. *Branch, supra,* 91 Cal.App.4th at page 284 upheld admission of a sex crime that was committed 30 years before the current crime. *People v. Pierce, supra,* 104 Cal.App.4th at page 900 upheld admission of a prior sex crime that occurred 23 years before the charged offense. *People v. Soto* (1998) 64 Cal.App.4th 966 [75 Cal.Rptr.2d 605] upheld admission of the appellant's molestation of two young girls 30 years before and 21 to 22 years before the current offenses. (*Id.* at pp. 977–978, 991–992.) *People v. Waples* (2000) 79 Cal.App.4th 1389 [95 Cal.Rptr.2d 45] upheld admission of a prior molestation that occurred during a period of time that was 18 to 25 years before the charged crimes. (*Id.* at pp. 1393, 1395.)

Although appellant's attack on T.N. occurred more than 30 years ago, the striking similarities between the prior kidnapping and rape and the current kidnapping and rape balance out the temporal remoteness. Appellant's modus operandi in both cases was virtually identical. Appellant gained contact with the victims by false pretenses. In T.N.'s case, he offered to give her a ride. In

the current case, he asked the victim to clean the garage. Then appellant separated the female victim from her male companion and moved her to a remote location where he felt comfortable and was in total control. In T.N.'s case it was the enclosed confines of appellant's car and in this case it was the locked garage on his compound. In both situations appellant secured the victim's compliance by causing her to fear him. In T.N.'s case, he struck her once and then threatened to kill her if she did not comply. In the current case, appellant forcibly pushed the victim past two rows of pews and ordered her to walk forward until they were near a tub full of water in which she had previously been submerged during a baptismal ceremony. A reasonable person in the victim's situation would objectively understand that appellant's movement of the victim next to the tub created an implied threat of drowning if she did not comply. Thus, in both situations appellant secured compliance by a blow or forcible shove followed by an explicit or implicit threat of death. Also, the sexual acts appellant engaged in were virtually identical and he released the victims afterwards.

Since appellant flatly denied raping the victim in this case and there was no forensic evidence proving that a rape occurred, evidence bearing on the respective credibility of appellant and the victim was highly probative. Testimony that appellant committed a similar sexual assault on another woman was relevant to prove common plan and to bolster the victim's credibility. It was also relevant to prove appellant's disposition to commit sexual offenses on women. Since appellant presented witnesses of his supposed sterling character, evidence proving that appellant sexually assaulted another woman provided a fuller portrait of appellant's character.

It was not likely that the jury would have been confused or misled by T.N.'s testimony. The prior crimes evidence was not extensive or time consuming. T.N. was the only witness on this topic and her testimony is recorded in just 54 pages of transcript. She was subject to cross-examination and appellant had a reasonable opportunity to prepare a defense to her testimony. Since appellant elected to testify, he had an opportunity to tell the jury his version of the events surrounding his encounter with T.N. and his no contest plea.

Appellant claims that T.N.'s testimony was "exceedingly inflammatory" because, unlike his conduct with the victim in this case, his conduct with T.N. "was depraved and sickening." We are not convinced. Appellant's conduct toward *both* women was "depraved and sickening," but it is his conduct in the *current* case that was more likely to have aroused the passions of the jurors against him. Appellant held himself out as a minister and was in a position of authority and trust. The psychological damage appellant inflicted

on the victim by raping her in the same location where she was baptized gives rise to a justifiable sense of outrage.[7]

Further, the record affirmatively proves that the jury did not convict appellant of the current charges due to outrage over the lenient plea bargain he secured in the prior case. The jury acquitted appellant of counts 4 and 5 and it found special finding No. 1 to be not true. If the jury had been inflamed by T.N.'s testimony and rendered a verdict that was based on passion, it would have convicted appellant of all charges. Yet, it did not do so. The jury returned a reasoned and reasonable verdict that was clearly the result of a careful examination of the evidence.

Accordingly, we uphold admission of T.N.'s testimony pursuant to Evidence Code section 1108, subdivision (a). The probative value of T.N.'s testimony was not substantially outweighed by the probability that its admission would necessitate undue consumption of time, create a substantial danger of undue prejudice, of confusing the issues or misleading the jury. Admission of the prior sex crimes evidence was not an abuse of discretion.

D. *Appellant's constitutional rights were not infringed.*

Without elaboration, appellant asserts that admission of T.N.'s testimony "violates the 'common-law tradition' of excluding propensity evidence [citation], and thus results in the denial of a defendant's rights to due process, a fair trial, and fundamental fairness under the Fifth, Sixth and Fourteenth Amendments." We are not persuaded.

"[O]ur Supreme Court has held that Evidence Code section 1108 is constitutional on its face . . . ." (*People v. Manning* (2008) 165 Cal.App.4th 870, 877 [81 Cal.Rptr.3d 452].) It has withstood both due process and equal protection challenges. (*Falsetta, supra,* 21 Cal.4th at pp. 907, 916–922 [no due process violation]; *People v. Fitch* (1997) 55 Cal.App.4th 172, 182–184 [63 Cal.Rptr.2d 753] [no equal protection violation].) The California Supreme Court "held that because of the protections written into Evidence Code section 1108, there was no undue unfairness in the statute's limited exception to the historical rule against the use of propensity evidence." (*People v. Manning, supra,* 165 Cal.App.4th at p. 878.) We are bound to follow the

---

[7] Appellant's related contention that the prosecutor exacerbated the allegedly prejudicial impact of T.N.'s testimony in opening and closing arguments was not preserved for appellate review because timely objection was not interposed on this ground at trial and the record does not show that such an objection would have been futile or counterproductive. (*People v. Hill* (1998) 17 Cal.4th 800, 820–821 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

decisions of our Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

■ "Courts presume a statute is constitutional. [Citation.] . . . To show a violation of due process, a defendant must show that the statute, as applied, offended a principle of justice so rooted in the traditions and consciousness of the country that it is considered fundamental. [Citation.]" (*People v. Manning, supra*, 165 Cal.App.4th at p. 877.) Appellant did not show that admission of T.N.'s testimony violated his due process or fair trial rights, as applied, by making the criminal trial fundamentally unfair. Accordingly, we reject appellant's challenge to the constitutionality of Evidence Code section 1108.

III.   *The No-contact Order Must Be Reversed.*

   A.   *Facts.*

At the end of the sentencing hearing on September 9, 2010, the prosecutor said, "And one further thing, we have prepared a no contact order too, Your Honor." The court replied, "I think it would be by law, that he wouldn't have any contact with her anyway." The prosecutor responded, "Maybe we could just make that an order?" The court answered, "Okay. And that will be an order. Very good." After the court pronounced its sentence, the prosecutor asked, "Are you going to do a no contact order?" The court responded, "Yes. And the defendant will have no contact whatsoever with the victim of his crimes."

The trial court's oral no-contact order is not reflected in the minutes of the sentencing hearing or the abstract of judgment. The record does not contain a no-contact order that was prepared by the People.

   B.   *The no-contact order is unauthorized.*

Appellant argues the no-contact order must be reversed because it was issued without any statutory authority. Respondent agrees with appellant.

■ This issue is cognizable despite appellant's failure to object to the no-contact order during the sentencing hearing. "A claim that a sentence is unauthorized . . . may be raised for the first time on appeal, and is subject to judicial correction whenever the error comes to the attention of the reviewing court. [Citations.]" (*People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6 [66 Cal.Rptr.2d 423, 941 P.2d 56].) "Although the cases are varied, a sentence is generally 'unauthorized' where it could not lawfully be imposed under any circumstance in the particular case. Appellate courts are willing to intervene

in the first instance because such error is 'clear and correctable' independent of any factual issues presented by the record at sentencing. [Citation.]" (*People v. Scott* (1994) 9 Cal.4th 331, 354 [36 Cal.Rptr.2d 627, 885 P.2d 1040].) "Because this case involves the jurisdictional validity of the trial court's decision to issue [an indefinite] protective order during sentencing, we will consider [appellant's] claim on the merits." (*People v. Ponce* (2009) 173 Cal.App.4th 378, 381–382 [92 Cal.Rptr.3d 667] (*Ponce*) [since protective order was not statutorily authorized, failure to raise issue below did not result in forfeiture].)

"It is not the content or format of the Judicial Council form that determines the propriety of the challenged protective order, but the authorizing statute." (*People v. Stone* (2004) 123 Cal.App.4th 153, 158 [19 Cal.Rptr.3d 771].) Several statutes permit entry of a protective order under certain circumstances in a criminal case. However, the no-contact order that was imposed in this case was not authorized by any of those statutes. For example, section 136.2, subdivision (a) authorizes issuance of a protective order during the duration of criminal proceedings. Yet, this statute does not authorize issuance of a protective order against a defendant who has been sentenced to prison unless the defendant has been convicted of domestic violence. (*Stone*, at p. 159; *Ponce, supra*, 173 Cal.App.4th at pp. 382–383; § 136.2, subd. (i).) Section 1203.1, subdivision (i)(2), which authorizes a no-contact order in some sex offense cases, only applies where the defendant is granted probation. Section 1201.3, subdivision (a) authorizes a no-contact order for a period of up to 10 years but only when the defendant was convicted of a sexual offense involving a minor victim. We are not aware of any statute that would provide a basis for the trial court to issue a no-contact order in this case during sentencing, much less one of unlimited duration.

In addition, "even where a court has inherent authority over an area where the Legislature has not acted, this does not authorize its issuing orders against defendants by fiat or without any valid showing to justify the need for the order." (*Ponce, supra*, 173 Cal.App.4th at p. 384.) Here, the prosecutor did not make an offer of proof or argument justifying the need for a no-contact order. The trial was finished and appellant was sentenced to prison. There was no evidence that after being charged appellant had threatened a witness or had tried to unlawfully interfere with the criminal proceedings. "[A] prosecutor's wish to have such an order, without more, is not an adequate showing sufficient to justify the trial court's action." (*Id.* at pp. 384–385.) Accordingly, we agree with the parties that the no-contact order is unauthorized and must be stricken. (*Id.* at p. 385; *People v. Selga* (2008) 162 Cal.App.4th 113, 121 [75 Cal.Rptr.3d 453]; *People v. Stone, supra*, 123 Cal.App.4th at p. 161.)

## DISPOSITION

The no-contact order that was orally imposed during the September 9, 2010, sentencing hearing is stricken. The judgment is affirmed in all other respects.

Gomes, J., and Detjen, J., concurred.

On September 7, 2012, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied November 28, 2012, S205098.