Filed 7/9/13  P. v. Melo CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055439 |
| v. | (Super.Ct.No. SWF10002012) |
| ESTEBAN MELO, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Michael B. Donner, Judge.  Affirmed.

David R. Greifinger, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton, and Joy Utomi, Deputy Attorneys General, for Plaintiff and Respondent.

On July 31, 2010, defendant Estaban Melo was involved in an altercation with the victim in front of a bar in Old Town Temecula. Defendant, along with two other men, punched the victim in his face while he was on the ground. Defendant was convicted of assault with force likely to produce great bodily injury within the meaning of Penal Code section 245, subdivision (a)(1).[1] The jury also found true the allegation that defendant personally inflicted great bodily injury within the meaning of sections 12022.7, subdivision (a) and 1192.7, subdivision (c)(8). He was sentenced to five years' probation and ordered to serve 180 days in county jail.

Defendant claims on appeal that he received ineffective assistance of trial counsel due to counsel's failure to properly oppose the People's motion in limine to exclude postings on a Facebook website by the victim following the altercation.

I

FACTUAL BACKGROUND

A.    *People's Case-in-Chief*

Brian Edwards[2] went to Baily's, a bar and restaurant located in Old Town Temecula in Riverside County on July 31, 2010. He was accompanied by his friends

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    Since there were several witnesses for whom no last names have been given, and some witnesses share the same last name, we will refer to all of the civilian witnesses by their first names for ease of reference and not out of disrespect.

Michelle Lindley, Andrea Salandra, and two other people, identified only as Daniel and Nikia.

Brian, Nikia, Andrea, and Michelle all walked from the parking lot toward the bar together. While they were walking, Brian made a comment to Andrea, asking her why she plucked her eyebrows so thin. After Brian said this, defendant, who was nearby, looked at him and asked what he had said. Brian responded with "attitude" that he was not talking to him. There were two other men with defendant. In describing all three, Brian stated that one was a taller Hispanic male with a bald head. Another was a shorter Hispanic male, also with a bald head, whom Brian identified as defendant. The third male had longer hair, and Brian could not identify his race.

Defendant and the other two men surrounded Brian. Brian said, "Okay. Am I supposed to be scared?" Brian tried to walk away but he was "struck" on the left side of his head. He did not know which of the three hit him. Brian struck back but did not recall if he hit defendant or one of the other two men. The ground was wet, and Brian slipped and fell. Once he was on the ground, all three of the men hit him in the head. Brian was throwing punches but did not know if he hit anyone. Security guards from Baily's pulled the men off of Brian.

Brian was bleeding from his nose and eye. He was yelling at the three men after they were pulled off him that they did not fight fair and was yelling obscenities at them. Defendant and the other two men wrestled with the security guards.

3

Brian sustained a cracked nose and had a cut over his eye.  He went to the hospital and got between six and eight stitches.  A photograph of his stitches and what he described as a bruised nose was shown to the jury.

Brian did not know defendant or the other two men prior to that night.  There was no question in Brian's mind that defendant hit him in the face.  Defendant was not wearing a shirt.  Brian thought defendant had a tattoo but did not base his identification on the tattoo.

According to Michelle, Brian and the person with the shaved head started "throwing fists . . . ."  Two other men "came out of nowhere" and started physically assaulting Brian.  All three men threw punches at Brian.  Brian fell to the ground, and the men continued to hit him.  One of the men got on top of Brian and was hitting him while he was on the ground.  Security guards pulled the man off of Brian.  Brian was bleeding from above his eyebrow and out of his nose.

According to Andrea, while they were walking to Baily's, defendant, whom Andrea identified, said something to Brian.  Defendant was with two other people.  She described one of them as having a shaved head and the other as having long hair.  They were all wearing shirts.

Brian said something back to defendant.  The other man with the shaved head hit Brian first.  Brian hit back.  Defendant then "threw a fist" at Brian.  Brian slipped but was able to get back up.  The three men then pushed Brian into the bushes.  The three men were using very aggressive force against Brian in throwing punches.  They were striking

4

him in the face. Defendant and the other man with the shaved head were hitting Brian; the man with long hair was standing to the side. Andrea described them as beating up Brian "pretty good." The security guards from the bar finally broke up the fight. At this point, defendant had his shirt off. All three men ran off up the street.

Brian had blood everywhere on his face, but the security guards cleaned him up. Andrea drove Brian to the hospital. Andrea was a licensed vocational nurse and removed Brian's stitches. She recalled there being six to eight stitches.

James Day worked as a security guard at Baily's in July 2010. On July 31, a fight occurred outside the front door of the bar. He recalled that a couple of individuals were assaulting another individual. At the time of trial, he could not recall descriptions of any of the people involved. He told officers at the scene that two Hispanic males were striking the victim in the face.

Richard Albert Kay, Jr., also worked at Baily's. On July 31, Kay was working at the front door checking identifications. Kay heard loud yelling coming from a nearby planter. He looked and saw a Black male being struck by two Hispanic males; one of the males was defendant. Day and Kay then went to break up the fight. Both of the Hispanic males were bald.

Kay described the two men as "swinging for the fences" and trying to do "damage." They were striking at his face. Kay observed a gash over the victim's eye. Kay wrestled one of the men to the ground. Kay pushed the other one to the side. Kay lost sight of defendant.

5

California Highway Patrol Officer Craig Johnson was patrolling the Old Town Temecula area that night. As he was driving, some pedestrians flagged him down. As he was being flagged down, he saw defendant with no shirt, and defendant appeared distraught. Officer Johnson stopped and talked to defendant. Defendant told Officer Johnson that some "black guy" at a bar had been talking "shit" about him. At trial, Officer Johnson could not recall if defendant had any injuries on his face.

Riverside County Sheriff's Deputy Adam Biondi responded to Baily's based on a report of a fight at the location. When he arrived, he met with Officer Johnson. Officer Johnson told Deputy Biondi that he had seen two men run from Baily's. One of the men was not wearing a shirt. Defendant was with Officer Johnson.

Deputy Biondi noticed a bump on defendant's forehead. Defendant told Deputy Biondi that he got in a fight with a "black guy" in the bar. Defendant did not tell him the details of the fight but said that "the black guy was talking shit on him."

Deputy Biondi spoke with Brian. Brian was holding a cloth near his left eye, and there was blood dripping from the area. Deputy Biondi did not have any of the potential witnesses try to identify defendant at the scene. Everyone was released.

B. *Defense*

On July 31, Maria Nunez had been at defendant's house. Defendant's brothers, Raul and Isaias Melo, were also at the house. A person named Francisco, who was known as Chevy, and Jose Diaz were present. Franscisco was dark with long black hair. Two other men with shaved heads were at the house, but no one knew their names. They

6

all were at the house to watch a fight on television. Raul, defendant, and Maria decided that they were going to go to Old Town Temecula to a restaurant called the Bank.

As they were walking to the Bank, they passed Baily's and saw a commotion. In the commotion, Maria and Raul saw the two men with shaved heads who had been at the house and Francisco. Maria saw them punching people. Raul saw Isaias pinned to the ground by a security guard.

In the commotion, defendant was pushed into the bushes by a security guard. At that point, a "black guy" jumped on defendant and started punching him. A security guard yelled that law enforcement was being called and that everyone should leave.

Raul and Maria left and went back to defendant's house. Maria and Raul assumed defendant had gone with someone else in their car. When they arrived back to the house, defendant was not there. Maria and Raul drove back to Baily's. When they arrived, defendant was speaking with law enforcement officers but was allowed to leave. Defendant was bleeding from his nose, and he was holding his shirt on it.

Jose drove with Francisco and Isaias to Old Town Temecula to meet Raul, Maria and defendant at the Bank. They also had to walk by Baily's to reach the Bank. As they walked up to Baily's, he saw a "couple dudes" arguing outside of Baily's. One of the men was Black. The other was a light-skinned, bald Hispanic male who had been at the house with him earlier in the evening. The two started throwing punches. As they were fighting, Raul, Maria, and defendant arrived.

7

A security guard pushed defendant into the bushes. Defendant fell to the ground. At that point, Jose, Francisco, and Isaias left.

Defendant testified on his own behalf. He was a second grade teacher who taught special education students. He confirmed the people who were at his house that night, including two individuals brought to the home by Francisco whom he did not know. He drove to Old Town Temecula with Raul and Maria. They were in the last car to leave his house.

As they were walking to the Bank, he observed that a security guard had Isaias in a choke hold, pinned to the ground. Defendant approached and told the security guard, "Let go of my brother. I got him." Defendant tried to help his brother by grabbing his waist. At that point, a security guard came and pushed him into the bushes.

After he was in the bushes, Brian was on top of him punching him in the face. Defendant had no prior contact with Brian before Brian started punching him. He was punched several times in the face by Brian. A security guard pulled Brian off of defendant. Everyone else started running after this because the security guards stated that law enforcement was on its way, but defendant stayed.

While defendant waited, two males joined Brian and confronted defendant. Brian had his shirt off and was already bleeding from his eye. The two males tried to attack defendant. Defendant walked across the street, and it was at this point a police officer began talking to him. Defendant took off his shirt to put it against his nose to stop the

bleeding. Defendant said nothing about a "black guy" giving him "shit." Defendant admitted that all of his friends left him at the scene.

Defendant did not have a tattoo on his chest.

II

INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Defendant asserts that he received ineffective assistance of trial counsel in relation to the exclusion of postings made on a Facebook website by Brian after the incident. The trial court excluded the posts based on the People's motion in limine. Defendant claims his counsel should have argued to the trial court that Facebook postings by the victim were admissible as third party culpability evidence, to support that Brian was the aggressor, and to show that Brian's injuries did not amount to great bodily injury. He additionally argues they were admissible to impeach Brian's testimony. He insists that his counsel's representation was ineffective and in violation of his federal and state constitutional rights to effective representation.

A.    *Additional Factual Background*

Defense counsel had provided the People with several Facebook posts that Brian made between August 2 and September 8, 2010. The postings included a statement in response to another post as to what had happened to him that stated, "some fuckin mexicans that couldnt fight by themselves lol I got 2 of them anyway i lumped up on[e] of there [*sic*] heads pretty good lol but yea I slipped and they got me lol." As to the injury he received, Brian stated, "not trippin its a beauty mark or a pimp scar." When

9

asked if it hurt by another person posting on the website, he stated, "hahaha its all good the shit dont even hurt that bad jus a needle and thread." Another person asked Brian where he had been and Brian responded, "at baileys lol in front of it they thought I was talkin to them and they got offensive but wen [*sic*] they saw that I wasnt scared they reacted lol." Brian also posted, "yes sir and it wasnt even a big deal those niggas fought like bitches and I happened not be runnin my mouth lol."

Prior to trial, the People brought a motion in limine that sought to exclude, among other things, evidence of third party culpability and the Facebook posts for any purpose other than impeachment. The People filed an additional motion regarding the admittance and exclusion of the Facebook postings. They argued that the postings should be excluded as hearsay, irrelevant, and more prejudicial than probative under Evidence Code section 352. The trial court understood that Brian would admit posting the statements so there was not a foundation issue.

Defense counsel orally argued for admission of the Facebook postings by Brian on the following grounds: "Well, with respect to the postings by my victim, they're not hearsay because I'm not offering them for the truth. What I'm offering is to show his attitude towards the entire event. He's engaged in a great deal of bragdesio [*sic*] on his face page. And he's, essentially, talking about what a tough guy he is, and that -- you know -- it's his attitude more than anything else. [¶] And he's not the one that says he got involved either. It's somebody else mentioning to him -- saying he got jumped. He doesn't even affirm that. He's just engaged in a lot of tough talk in this. So I think it

10

does go to his mental state at the time. And his mental state at the time is certainly relevant. His mental state at the time of the incident is relevant. So I'm not offering it for the truth of anything. It goes to his mental state."

The People responded that the postings occurred days after the event so his mental state after the event was not relevant. Also, if defendant's counsel was not offering it for the truth of the statements, it was not relevant. If they were offering it for the truth, then it was hearsay and only could be used for impeachment.

The trial court found that Brian's mental state after the event was not relevant. The trial court also noted the language used, especially "niggas" and "fuckin mexicans" was highly inflammatory. The trial court stated, "And there's a visceral response to language like that by members of those ethnic groups." The trial court tentatively excluded the statements and would revisit the issue if defense counsel sought to impeach Brian with the statements after his testimony. However, the trial court noted, "But right now, on a 352 analysis, it's very, very prejudicial with that language. And then I want to repeat, as counsel pointed out, it does not reflect state of mind on the date of incident." The trial court put the onus on the parties to revisit the issue later; otherwise, the tentative to exclude the evidence would stand. There was no further mention of the Facebook postings at trial.

B.    *Standard of Review for Ineffective Assistance Counsel Claims*

"'The law governing defendant's claim [of ineffective assistance] is settled. "A criminal defendant is guaranteed the right to the assistance of counsel by both the state

and federal Constitutions. [Citation.] 'Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to *effective* assistance.'" [Citations.] It is defendant's burden to demonstrate the inadequacy of trial counsel. [Citation.] We have summarized defendant's burden as follows: "'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."'" [Citation.] [¶] Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." [Citation.] Defendant's burden is difficult to carry on direct appeal, as we have observed: "'Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission.'" [Citation.]' [Citation.] If the record on appeal ""'sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be

12

rejected,"' and the 'claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding.' [Citation.]" (*People v. Vines* (2011) 51 Cal.4th 830, 875-876, superseded by statute on other grounds as stated in *People v. Robertson* (2012) 208 Cal.App.4th 965.)

C.      *Deficient Representation*

Here, defendant claims that his counsel was deficient for failing to seek to admit the Facebook postings as third party culpability evidence, to prove Brian was the aggressor, to combat the evidence that Brian received great bodily injury, and to impeach Brian's trial testimony. We disagree.

Defendant's argument is based on his interpretation of the postings that they established third party culpability and that Brian was the aggressor. However, it is also reasonable to conclude otherwise. Even assuming the postings were admissible despite being hearsay, the statements did not establish that a party other than defendant was responsible for punching him, i.e., that a third party was culpable. Brian identified his assailants in the postings as "[M]exicans," and all of the witnesses stated that the men who attacked Brian were Hispanic. Brian does not state that someone other than defendant was present and only that person hit him. The postings did not establish a third party who was responsible for the crime.

Further, the posting that "some fuckin mexicans that couldnt fight by themselves lol I got 2 of them anyway i lumped up on[e] there [*sic*] heads pretty good lol but yea I slipped and they got me" did not establish Brian was the aggressor. Brian and Michelle

13

testified at trial that he fought back against the men. The postings only established that Brian fought back against two men who were attacking him.

Counsel's failure to make a futile motion or objections is not ineffective assistance. (*People v. Price* (1991) 1 Cal.4th 324, 387.) Counsel reasonably could have concluded that the statements in the postings did not establish third party culpability or that Brian was the aggressor.

Moreover, the postings did not show that Brian's injuries did not amount to great bodily injury. In order to prove great bodily injury, the People needed only to prove there was a substantial or significant injury. (§ 12022.7, subd. (f).) In *People v. Escobar* (1992) 3 Cal.4th 740, the California Supreme Court noted that the definition of "great bodily injury" within the meaning of section 12022.7 does not require "'permanent,' 'prolonged' or 'protracted' disfigurement, impairment, or loss of bodily function." (*Escobar*, at p. 750.) Injuries such as "multiple contusions and swelling of [the] hands, arms and buttocks," "multiple abrasions and lacerations to the victim's back and bruising of the eye and cheek," and a "swollen jaw, bruises to head and neck and sore ribs" all are sufficient. (*Id*. at p. 752.)

Here, the testimony established that Brian needed six to eight stitches. The fact that Brian discounted the injury as just a "pimp scar" did not establish that a substantial injury did not occur. It was clear that Brian was trying to brag that he did not get injured as much as the evidence showed at the scene and at the hospital. Trial counsel

14

reasonably could conclude such evidence would not contradict that Brian received great bodily injury and was irrelevant.

Additionally, the postings were not inconsistent statements that would allow admission of the statements as impeachment evidence. Defendant does not provide the statements that were inconsistent with Brian's trial testimony that could have been used for impeachment. We do not consider the statements by Brian to be necessarily inconsistent. Trial counsel cannot be faulted for interpreting the statements as not being inconsistent. In fact, the statements corroborate Brian's testimony that he was ganged up on by defendant and his cohorts.

The Facebook postings were not admissible pursuant to the theories espoused by defendant for the first time on appeal or for impeachment. Nonetheless, even if we consider that the trial court would have allowed the postings, the record does not shed light on why counsel failed at trial to seek admission of the postings, especially for impeachment. However, that does not mean there was no valid tactical reason. Since the record on appeal sheds no light on why counsel did not seek further admission of the Facebook postings, the claim must be rejected. Such a claim is more appropriately decided in a habeas corpus proceeding. (*People v. Vines, supra,* 51 Cal.4th at p. 876.)

D.      *Prejudice*

Even assuming that defense counsel was ineffective for failing to argue that the postings should have been admitted, and such postings would have been admitted at trial, defendant must still show "prejudice flowing from counsel's performance or lack thereof.

15

Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citation.]" (*People v. Williams* (1997) 16 Cal.4th 153, 215.)

Here, the postings only went to Brian's credibility. However, several other witnesses testified that Brian was attacked by defendant. Defendant's witnesses -- who were all his friends and relatives -- claimed that Brian was on top of defendant hitting him. However, this was inconsistent with not only Brian's friends' statements but also the disinterested security guards' statements. This also was inconsistent with the injuries sustained by the parties. Defendant had a small bump on his head while Brian had more severe injuries, one of which required six to eight stitches.

Additionally, there was strong evidence that Brian sustained great bodily injury. Brian and Andrea both testified that he was bleeding from the gash in his eye that required six to eight stitches. A trier of fact could reasonably determine that a punch to a person that required stitches qualified as great bodily injury. The fact that Brian thought it was just a "pimp scar" did not diminish that he received great bodily injury. The evidence strongly established that defendant committed assault on Brian causing great bodily injury.

Based on the foregoing, defendant did not receive ineffective assistance of trial counsel, and even if his counsel was ineffective, he cannot show prejudice.

16

## III

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
J.

We concur:

McKINSTER
Acting P. J.

KING
J.

17