Filed 2/18/14  P. v. Ford and Young CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>LAMARR GLEN FORD and JOEL ANDRE YOUNG,<br><br>    Defendants and Appellants. | G048952<br><br>(Super. Ct. No. RIF10003370)<br><br>O P I N I O N |

Appeals from judgments of the Superior Court of Riverside County, Christian F. Thierbach, Judge.  Affirmed.

Michael B. McPartland, under appointment by the Court of Appeal, for Defendant and Appellant Lamarr Glen Ford.

Richard Jay Moller, under appointment by the Court of Appeal, for Defendant and Appellant Joel Andre Young.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Jennifer B. Truong, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Lamarr Glen Ford of five counts of robbery (Pen. Code, § 211; counts 4-6, 9, and 13), four counts of false imprisonment (*id.* § 236; counts 7, 8, 11, and 12), and one count of assault with a firearm (*id.* § 245, subd. (a)(2); count 10), and found true allegations he had personally used a firearm during counts 4, 6, and 9 (*id.* §§ 12022.53, subd. (b), 1192.7, subd. (c)(8)), counts 7, 8, and 10 (*id.* §§ 12022.53, subd. (a), 1192.7, subd. (c)(8)). The trial court thereafter found Ford had suffered one prior strike conviction (*id.* § 667, subd. (a)) and 17 prior serious felony convictions (*id.* §§ 667, subds. (c), (e)(2)(A), 1170.12, subd. (c)(2)(A)). It sentenced him to five consecutive 25-years-to life terms on the robbery convictions, consecutive 10-year terms on the firearm use enhancements attached to three of the robbery convictions, and a consecutive five-year term for the prior serious felony enhancement for a total of 160 years to life; the sentence on counts 7, 8, and 10 was stayed under section 654 and concurrent sentences of 25 years to life were imposed on counts 11 and 12.

A separate jury found defendant Joel Andre Young had participated in two of the robberies committed by Ford and convicted him of two counts of robbery (Pen. Code, § 211; counts 9 and 13), with a true finding he was armed with a firearm during count 9 (*id.* § 12022, subd. (a)(1)), and two counts of false imprisonment (*id.* § 236; counts 12 and 13). Subsequently, the court determined Young's prior serious felony (*id.* § 667, subd. (a)) and prior strike conviction true (*id.* §§ 667, subds. (c), (e)(1), 1170.12, subd. (c)(1)), and sentenced him to 14 years in prison, consisting of six years on count 9, a consecutive one-year term for the attached firearm use enhancement, a consecutive term of two years on count 13, and a consecutive term of five years on the serious prior enhancement; concurrent sentences of four years each on counts 11 and 12 were also imposed.

Young argues the court erred in denying (1) Ford's motion to conduct an in camera review of three officers' personnel files under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*), superseded by statute as stated in *City of San Jose v. Superior*

2

*Court* (1993) 5 Cal.4th 47, 51-52, which he joined at trial and (2) his motion under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 to strike his prior strike conviction.  Ford in turn contends the court abused its discretion in and violated his due process rights by admitting into evidence, over objection, five uncharged robberies he committed in 1990.  Although defendants join in other claims, only Young's *Pitchess* argument applies to both.  Finding no error, we affirm the judgments.

FACTS

Ford and Young are both five feet six inches tall Black males who were 38 years old at the time of the charged offenses.  Ford weighed 155 pounds and had a mustache.  Young was five pounds heavier, had a mustache and a goatee, and lived in Banning, California with Ford's sister, whom he was dating.

Between December 2008 and February 2009, a number of armed robberies of payday loan businesses occurred in Hemet, Banning, and Moreno Valley.  The following facts relate to the counts filed against Ford.  We omit facts relating to the charges alleged against Young due to their irrelevancy to the issues raised in his appeal.

a. *Count 4 (Robbery of Nicole Graves)*

Around 5:45 on December 19, 2008, a Black man wearing "mechanics type of coveralls," a wig with dreadlocks past his shoulders with a baseball hat on top, sunglasses, and possibly a fake beard, entered the Hemet branch of Advance America, a cash or payday loan business, and approached the counter where Nicole Graves was working.  Holding the gun sideways on the counter, the man pointed it at Graves and ordered her to "Put the hundreds in the bag" he gave her.  The bag was a zippered bag, similar to the ones banks use for deposits, slightly larger than an envelope and about 5 inches long on one side.  After she emptied her register into the bag, the man ordered her

3

to do the same with the other registers. Once she complied and gave him the bag, the man said, "'Get on,'" walked out the front door, and got into a white car that had been left running. A man outside the business took down the license plate of the car and gave it to the police, who determined it had been reported stolen out of Riverside.

In February 2009, Graves was unable to identify Ford's picture in a photographic lineup. The next day, upon being presented with a different photographic lineup, Graves said photograph number 4, depicting Young, looked like the robber.

. Graves first identified Ford as the person who had robbed her at the preliminary hearing but was not certain. At trial, outside the presence of the jury, the trial court had both Ford and Young say, "Get on." Graves then testified before the jury that based on Ford's voice, complexion, nose, chin, and cheeks, she was "100 percent" certain he was the robber. She also positively identified two photographs of Ford as the person who had robbed her, including one taken in December 2010 which she described as "identical down to the fake beard, what I thought was a fake beard."

*b. Count 5 (Robbery of Taneisha McNair)*

On January 14, 2009, another employee of the same Advance America was robbed. Around 5:45 p.m., a man about five feet five inches or five feet six inches tall, weighing approximately 150 pounds, and wearing a navy coverall "like the kind mechanics wear," a beanie or ski mask, a black hoodie, and gloves, entered the business. The man laid a gun on its side on the counter and pointed it at customer service representative Taneisha McNair, and ordered her not to push any buttons and to place all the money in the register into a money bag or "pencil holder" that he held on the counter. When she finished, he told her to empty the other register but she told him there was no money in there. The man took the pouch and the gun, said, "'Get on,'" then exited the store and got into a white car parked in front of the business.

4

McNair told police she could not identify the robber because she could not see his face but believed he was in his mid-thirties. Nor could she tell whether the robber was Black, Caucasion, or Hispanic, although she believed the robber was a Black male based on his voice. At the preliminary hearing, she heard both Ford and Young say, "'Get on.'" She told police Young's voice sounded familiar.

A few days later, investigating officer Michael Elmore, located the white car used in December 19, 2008, robbery of Advance America, about three to four blocks away from the robbery site. The fingerprint found did not match any suspects and police believed the car had been wiped down.

*c. Counts 6 (Robbery of Shane Shehee), 7-8 (False Imprisonment of Sherri Mayes and Tim Angelini)*

On February 7, 2009, around 11 a.m., a Black man with some facial hair on his chin, about five feet five inches tall, weighing approximately 140 to 150 pounds, and wearing a one piece orange hoodie, a big orange jacket, and a "[b]lack meshy face mask," walked into Check into Cash, a payday loan banking institution similar to Advance America, located in Hemet. At the time, store employee Shane Shehee was helping a customer at the counter. The man placed a gun on the counter with his hand on it, gave Shehee a money bag with a zipper like the ones banks use, and told him, "'Give me the money, you know the drill.'" After Shehee placed the money from his register into the bag, the man pointed the gun at him and said to empty the remaining registers. After Shehee did so, the man ordered everyone into the bathroom in the back of the store and asked for the surveillance videotape. The man told them to wait 10 seconds before coming out and left the store. Shehee believed the man was in his mid-thirties and said something to the effect of "'get on'" after completing the robbery.

5

*d. Counts 9 (Robbery of Rebecca Young), 10 (Assault with a Firearm on Jose Alcala), 11-12 (False Imprisonment of Lashaunda Buckley and Katherine Baldwin)*

On February 13, 2009, around 4:15 p.m., a five foot five inches or five foot six inches tall Black man, weighing between 150-170 pounds and wearing a mechanics jumpsuit, a mask, a sweatshirt with a hood pulled over his head, and black gloves, entered an Advance America branch located in Banning. The man walked up to where store employee Rebecca Young (Rebecca) was helping a customer. He laid a black gun on its side on the counter aimed at Rebecca, gave her a zippered bag "the size of a money pouch," about "four inches wide by six to eight inches in length," and ordered her to empty her cash drawer, and then the other registers, into the bag. The man then had everyone in the store go to the back bathroom and pointed a gun at a customer. The man then asked for money in the safe, everyone's cell phones, and the surveillance videotape.

At both the preliminary hearing and trial, Rebecca testified she did not recognize anyone because she had not seen the robber's face. Nor could Rebecca determine the man's race, although she described the robber to the police as "a [B]lack male, possibly Hispanic" based on his voice. She also recognize Ford at trial because he had entered the Banning Advance America branch a week or two before the robbery to inquire about a payday loan.

*e. Count 13 (Robbery of Michelle Ramirez)*

Also on February 13, around 5:30 p.m., as employees were preparing to close up, an approximately five foot four inches tall man, entered a Check into Cash branch in Moreno Valley wearing dark blue mechanics coveralls, a hoodie over his head, and a ski mask. He approached employee Michelle Ramirez and told her to put the money into a money bag he gave her and not to push any buttons. The man's other hand was in his pocket and Ramirez believed he might have a gun. At the man's instructions, Ramirez emptied her drawer and then the others. The man told the employees, "'Y'all go

6

in the back'" but did not follow them and left. Ramirez could not determine the robber's race.

DISCUSSION

*1. Denial of Pitchess Motion*

Ford's attorney filed a *Pitchess* motion to discover the personnel records of police officers Jeremy Bobo, Marcus Futch, and Greg Herrington. Young joined in the motion. The trial court denied the motion after finding the supporting declaration failed to show the officers' alleged misconduct had any relevance to the defense asserted by Ford and Young. Young, joined by Ford, contends the court erred in so ruling with respect to Bobo and Herrington without conducting an in camera review of the requested documents. We disagree.

To be sufficient, a *Pitchess* motion must include, among other thing, an affidavit showing good cause for the discovery of a peace officer's personnel records "first by demonstrating the materiality of the information to the pending litigation, and second by 'stating upon reasonable belief' that the police agency has the records or information at issue." (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1019 (*Warrick*).) "[D]efense counsel's declaration . . . must propose a defense or defenses to the pending charges" and "articulate how the discovery sought may lead to relevant evidence or may itself be admissible direct or impeachment evidence [citations] that would support those proposed defenses." (*Id*. at p. 1024.) It must also "describe a factual scenario supporting the claimed officer misconduct." (*Ibid*.) In some circumstances, the factual scenario "may consist of a denial of the facts asserted in the police report." (*Id*. at pp. 1024-1025.) Such a denial may establish a reasonable inference that the reporting officer may not have been truthful. (*Id*. at p. 1022.) But this is not true for all cases. "What the defendant must present is a specific factual scenario of officer misconduct that

7

is plausible when read in light of the pertinent documents." (*Id*. at p. 1025.) We review the denial of a *Pitchess* motion for abuse of discretion. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1228.)

Here, through his counsel's declarations, Ford denied involvement in the charged offenses and asserted Bobo and Herrington "failed to conduct a thorough investigation into the incident, and may have targeted [him] for improper reasons and with improper methods," and "falsely accused" Ford as a result of a "faulty investigation." Counsel further declared the officers had "a character for, and habit and custom of misconduct, fabricating probable cause, planting evidence, giving false testimony, committing acts of moral turpitude and being dishonest," and that their credibility would be with "specific instances of such conduct." On information and belief, counsel also asserted "'a likely issue at trial' will be [the officers'] use of excessive force, lack of veracity, possible false arrest, illegal search and seizure, the fabrication of charges and/or evidence, dishonesty and improper tactics . . . , such as conduct unbecoming an officer, neglect of duty, and false arrest." This declaration was insufficient to support the granting of defendant's *Pitchess* motion.

*People v. Thompson* (2006) 141 Cal.App.4th 1312 is instructive. The defendant there was arrested after he sold cocaine to an undercover police officer. Uniformed officers who were not part of the undercover operation searched the defendant and found two $5 bills, which were later identified as the bills the undercover officer gave to the defendant for the cocaine. (*Id*. at p. 1315.) In a *Pitchess* motion, defense counsel asserted the police had arrested the defendant simply because he was in the area and decided to frame him once they realized he had a criminal history using their cocaine and money. (*Id*. at p. 1317.) *Thompson* affirmed: "This showing is insufficient because it is not internally consistent or complete. . . . [I]t does not present a factual account of the scope of the alleged police misconduct, and does not explain [the defendant's] own actions in a manner that adequately supports his defense. [The defendant], through

8

counsel, denied he was in possession of cocaine or received $10 . . . .  But, he does not state a nonculpable explanation for his presence in an area where drugs were being sold, sufficiently present a factual basis for being singled out by the police, or assert any 'mishandling of the situation' prior to his detention and arrest.  Counsel's declaration simply denied the elements of the offense charged."  (*Ibid*.)

The declaration of Ford's counsel is even less sufficient.  In *Thompson*, defense counsel at least explained what was supposedly false in the police reports and offered an alternative account, although it was insufficient because he did not support it with enough explanatory detail.  Here, counsel did not provide an alternate version of the facts underlying the charges against him but rather simply denied the allegations.  In doing so, he did not articulate any plausible, factually specific scenario to explain how Bobo or Herrington erroneously determined he was a suspect, why they would falsely accuse him, or in what manner their investigation was faulty.  (See *Warrick*, *supra*, 35 Cal.4th at p. 1021 [*Pitchess* discovery "is limited to instances of officer misconduct related to the misconduct asserted by the defendant"].)

Defendants maintain "there was a 'plausible alternative scenario' that [they] were] entitled to explore, given that credibility is 'always at issue.'"  Mere relevance to credibility, however, is insufficient to warrant disclosure absent a showing of good cause.  (See *California Highway Patrol v. Superior Court* (2000) 84 Cal.App.4th 1010, 1023-1024.)  Defendants also assert the officers "used deception as a technique" in interviewing him.  But deception during a police interview is permissible where it is not "'"'of a type reasonably likely to procure an untrue statement'"'"" (*People v. Williams* (2010) 49 Cal.4th 405, 443) and there is no claim that occurred here.  Thus, neither the use of deception nor defendants' claim that "what was said before the interview was not" recorded, "present[ed] . . . a specific factual scenario of officer misconduct," much less one "that is plausible when read in light of the pertinent documents."  (*Warrick*, *supra*, 35 Cal.4th at p. 1025.)

*2. Denial of Young's Romero Motion*

Young moved to dismiss his prior strike conviction, claiming he fell outside the spirit of the "Three Strikes" law because he (1) was convicted only of being the get-away driver in two robberies; (2) did not enter the businesses nor personally carry a gun during the crimes; (3) committed the crime alleged as a strike and his prior serious felony offense 17 and 13 years ago respectively; (4) had remained free from custody after his parole in 2001 until his arrest in 2009 for the current offenses; (5) had tried to turn his life around by working various jobs; and (6) believed he could "still be a productive member of society." Young's father requested leniency to allow his son, who grew up in a Christian home and "knows the right way" but had "bad judgment," to "have a chance to straighten out his life, take care of his wife and his kids, and . . . get his life back on track." Young also asked for lenience, as he had "been a law-abiding citizen and a contributing member to society" "[f]or the past 12 years" and wanted "the opportunity to become again employed and be able to take care of [his] sick wife, [his] family, and [his] home." The court denied the motion.

Young contends the court's denial of his *Romero* motion was an abuse of discretion. We disagree.

A trial court has the discretion to strike a prior strike only if the defendant falls outside the spirit of the three strikes law. (Pen. Code, § 1385, subd. (a); *People v. Williams* (1998) 17 Cal.4th 148, 162 (*Williams*).) The court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Williams*, at p. 161.)

We will not reverse the ruling on a *Romero* request unless the defendant shows the decision was "so irrational or arbitrary that no reasonable person could agree

with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377 (*Carmony*).) Reversal is justified where "the trial court was not 'aware of its discretion'" "to strike a prior felony conviction allegation" or "considered impermissible factors" to support its refusal to do so. (*Id*. at p. 378.) But where the trial "'court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling.'" (*Ibid*.)

In denying Young's request to strike a prior strike, the trial court, after noting Young's criminal record and the circumstances of the current offenses, could not "with any degree of intellectual honesty conclude that he falls outside the spirit of the three-strikes law." The offenses were "very serious offenses" and although the court agreed Young "was not the main actor . . . , he was, nonetheless, a willing participant. While he may have been someone under the domination of . . . Ford, he nonetheless played a very significant role in the commission of these very serious and indeed violent offenses." Accordingly, the court could not and would not conclude Young fell "outside the spirit of the three-strikes law." These statements demonstrate the court was fully aware of its discretion to strike a prior conviction and did not consider impermissible factors. (*Carmony*, *supra*, 33 Cal.4th at p. 378.)

Young's reliance on *People v. Bishop* (1997) 56 Cal.App.4th 1245 (*Bishop*) is misplaced. First, *Bishop*, in deferentially reviewing the trial court's act of striking two of the defendant's prior strike convictions, upheld that exercise of discretion. Here, we deferentially review the court's denial of Young's motion to strike his prior strike conviction. The court considered the proper criteria in ruling on defendant's motions, and we may not substitute our own judgment. (*Id*. at pp. 1250-1251; *Carmony*, *supra*, 33 Cal.4th at p. 377.) Second, *Bishop* predates *Williams*, *supra*, 17 Cal.4th 148, and consequently did not apply the appropriate standard: whether the defendant should be deemed to fall outside the scheme's spirit. The court here applied the correct standard

and its denial of the motion was not "so irrational or arbitrary that no reasonable person could agree with it." (*Carmony*, at p. 377.)

### 3. Admission of Ford's Prior Uncharged Offenses

Ford contends the court prejudicially erred and violated his due process rights by admitting evidence he committed five uncharged robberies in 1990 to show identity and intent. We disagree.

#### a. Background

Before trial, the prosecutor moved to introduce evidence of six uncharged robberies in which Ford had taken property or money at gunpoint from different victims, arguing it was admissible under Evidence Code section 1101, subdivision (b) (all further undesignated statutory references are to this code) to establish intent and identity. Ford opposed the motion on the grounds the prior offenses were not sufficiently similar to the present ones to establish they were committed by the same person because the only similarities were the use of a gun and the crime of robbery and that any relevance was outweighed by its prejudicial effect given the weak identity evidence against him.

The trial court found intent was not "much of an issue" because Ford had pointed a gun at the victims but nevertheless admitted the evidence for that purpose given that Ford had placed it in dispute by pleading not guilty. Although it determined one incident "overly prejudicial," it admitted evidence of the other five, finding the prior offenses were "sufficiently similar in nature" to the current ones to outweigh any prejudicial effect under section 352 given the use of a gun to threaten the victims. When asked by Ford's counsel if the evidence was being admitted for intent or identity, the court answered, "Both." The prosecution presented evidence of the five prior uncharged robberies and Ford stipulated he suffered five armed robbery convictions as a result.

*b. Analysis*

Although section 1101, subdivision (a) prohibits the admission of evidence of a person's character to prove a persons conduct on a specified occasion, evidence of uncharged acts committed by the defendant is admissible to prove some other fact, such as identity or intent. (§ 1101, subd. (b).) Even where a defendant's uncharged criminal conduct is relevant to establish one of these issues, "to be admissible such evidence 'must not contravene other policies limiting admission, such as those contained in . . . section 352.'" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404 (*Ewoldt*), superseded by statute on other grounds as stated in *People v. Robertson* (2012) 208 Cal.App.4th 965, 991.) We review the trial court's admission of evidence of uncharged conduct for abuse of discretion. (*Ewoldt*, at p. 405.) Even if error in admitting prior crimes evidence under section 1101 occurred, it is not prejudicial where "it is not reasonably probable that a result more favorable to defendant would have resulted absent admission of this evidence." (*People v. Welch* (1999) 20 Cal.4th 701, 749-750; *People v. Watson* (1956) 46 Cal.2d 818, 836.) We conclude any error in the admission of the prior offenses for purposes of showing intent and identity was harmless.

Ford is correct that the only real issue was the identity of the robber and that the respondent's brief incorrectly cites evidence, i.e., a recording of Young's interview by police, presented only to Young's jury. Nevertheless, besides that evidence and the evidence of Ford's uncharged misconduct, sufficient evidence exists to support Ford's convictions.

As to count 4, Graves testified she was "100 percent" sure Ford was the person who robbed her in December 2008. This was based on his voice when he said, "'Get on'" as he left Advance America, as well as his complexion, nose, chin, and cheeks. The next month, the robber said, "'Get on'" again as he left the same Advance America after robbing McNair (count 5). And the month after that, the robber said either the same thing or something similar after robbing the Check into Cash in Hemet (count

13

6). As the prosecutor noted during closing argument, the phrase "'Get on'" is not a common saying. These three robberies all occurred within miles from Ford's home. Young's residence where he lived with Ford's sister, whom he was dating at the time, was about five miles away from the Banning robbery and about 17 or 18 miles from that robbery to the one in Moreno Valley.

Although only Graves was able to positively identify Ford, the other four victims described the robber as about five feet four inches to five feet six inches tall and three of them approximated his weight as between 140 to 170 pounds. All but the last robbery victim (count 13) described the robber as Black. Ford is a five foot six inch tall Black man weighing 155 pounds.

The modus operandi in all five robberies is also similar. All five involved the same cash or payday loan type business, either an Advance America or a Check into Cash, a zippered rectangular money bag that the robber handed the victim, and the robber telling the victim to first empty her or his drawer and then the others into the bag. In all but the last robbery (count 13), the robber walked into the business, placed a gun sideways on the counter and aimed at the victim to ensure compliance with his demands. Once that was done, the robber either left after saying "'Get on'" or something similar or ordered everyone into the back before leaving. Additionally, all but one robbery (count 6) occurred in the late afternoon with the robber wearing mechanics overalls. Moreover, the victim of count 9 (Rebecca Young) recognized Ford as having entered her branch to inquire about a payday loan, notwithstanding the fact he was unemployed at the time, from which it could be inferred he was casing the business. A reasonable jury could find Ford guilty of the five robbery counts based on the evidence presented in this case, including the similar modus operandi employed in the string of robberies and Graves's positive identification of Ford as the perpetrator of the robbery in which she was the victim.

14

Ford disregards these similarities and maintains the admission of evidence of his uncharged offenses was prejudicial because Graves was the sole victim to positively identify him as the robber in one of the five robbery charges and the remaining four robbery charges rested on that identification and the prosecution's theory they had similar modus operandi. Ford challenges Graves's identification because (1) she only had "a limited view of the robber because he was wearing a hood over his head and the robbery only lasted for a couple of minutes"; (2) Graves failed to identify him in a photographic lineup containing his photo and did not identify him until a year and a half later at the preliminary hearing; and (3) McNair (count 5) had indicated at the preliminary hearing that Young's voice sounded like the robber's. All of these contentions, however, were made by Ford's counsel during closing argument and rejected by the jury. During closing argument, Ford also pointed out the physical similarities between Ford and Young and, on appeal, Ford notes Young had been charged with a robbery involving a modus operandi similar to the ones Ford was convicted based on the victim's identification of Young. But the fact "[t]hat the evidence in some instances might be reconciled with a contrary finding . . . is not a basis for reversal of any of defendant's conviction[s]." (*People v. Prince* (2007) 40 Cal.4th 1179, 1261.)

Ford also asserts the jury had doubts about Graves's identification and considered this a close case because it asked to see the videotape of the robbery where she was the victim and the separate photographic lineups containing pictures of Ford and Young, plus deliberated for a day and a half. He also claims the court's limiting instruction "did not explain to the jury that they should not consider the uncharged offenses to show that [he] had a criminal disposition." Ford concludes that because the court instructed the jury it "could consider evidence of [his] uncharged robbery offenses in determining if [he] was the [one] who committed" them, "the jury would have likely reasoned that if he did it once, he probably did it this time." We are not persuaded.

15

Contrary to Ford's assertion that the limiting instruction did not explain the uncharged offenses could not be used to demonstrate his criminal disposition, the court expressly instructed the jury that it "may but are not required to consider that evidence for the limited purpose of deciding whether or not [Ford] was the person who committed the offenses alleged in this case, or whether the defendant acted with the intent required to commit the robberies in this case. [¶] . . . [¶] Do not consider this evidence for any other purpose, except for the limited purpose of identity and the intent of the perpetrator. [¶] *Do not conclude from this evidence that [Ford] has a bad character or is disposed to commit a crime.* [¶] If you conclude that [Ford] committed the uncharged offenses, that conclusion is only one factor to consider, along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the robberies charged in this case. The People must still prove each charge beyond a reasonable doubt." (Italics added.) "The presumption is that limiting instructions are followed by the jury. [Citation.] That presumption is not rebutted here." (*People v. Waidla* (2000) 22 Cal.4th 690, 725.)

The jury's request to see the videotape and photographic lineups and the length of its deliberations demonstrates it convicted Ford only after carefully contemplating the evidence including Graves's identification and resolving the issue against Ford. Nothing in the record suggests the jury considered Ford's prior uncharged offenses for any purposes other than intent or identity. That the jury asked to review certain evidence shows it did not blindly base its verdicts on Ford's propensity to commit crimes but instead carefully took into account all of the relevant evidence as instructed by the court. Thus, it is not reasonably probable that a verdict more favorable to Ford would have resulted if the evidence of the uncharged misconduct had been excluded. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

16

DISPOSITION

The judgments are affirmed.

RYLAARSDAM, ACTING P. J.

WE CONCUR:

MOORE, J.

FYBEL, J.

17