Filed 8/27/15  P. v. Woods CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066835 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD241880) |
| ROBERT JAMES WOODS, SR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Howard H. Shore, Judge.  Affirmed.

Sheila Quinlan, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr. and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Robert J. Woods, Sr. of three counts of lewd acts on his then 12-year-old daughter A. (Pen. Code, § 288, subd. (a)). Woods was sentenced to a determinate term of 10 years in prison.

Woods appeals contending the trial court abused its discretion in admitting evidence of prior sexual acts committed on two different women (A.P. and Amelia)[1], when they were children, pursuant to Evidence Code[2] section 1108. We will find the trial court made a careful and extensive weighing of the probative value of the evidence as against its prejudicial effect (§ 352). The court limited the scope of the propensity evidence admitted under section 1108 in order to minimize any possible prejudice and to avoid confusion and the undue consumption of time. The court acted well within its discretion to allow the propensity evidence under section 1108.

Woods also complains that the court instructed the jury with CALCRIM No. 1191. Woods does acknowledge however, that our Supreme Court has upheld a virtually identical CALJIC instruction and that the Courts of Appeal have upheld the use of CALCRIM No. 1191. Woods is essentially seeking to preserve the instructional issue for possible federal review.

---

[1]  We use the first names of the three women who were victims of sexual acts in order to protect their privacy. No disrespect is intended.

[2]  All further statutory references are to the Evidence Code unless otherwise specified.

STATEMENT OF FACTS

The parties do not dispute the facts underlying the charged offense regarding A. Indeed, Woods does not challenge either the admissibility or sufficiency of the evidence to support the convictions regarding acts against A. His evidentiary challenge is to the admissibility of the propensity evidence introduced regarding acts involving his older daughter, A.P., and a 14-year-old student of his, Amelia. Accordingly we will accept the statement of facts regarding the acts against A. as set forth in the appellant's opening brief as a valid summary of the facts of the offenses. We will discuss the evidence regarding acts involving A.P. and Amelia in the discussion section which follows:

In November 2010, 12-year-old A. lived in a two-bedroom, two-bathroom apartment with her father, the appellant in this case, and her stepmother.

Around this time, every morning A. would go to appellant while he was lying in bed and say goodbye to him, kissing him on the cheek before she left for school. Appellant would then tell A. that the kiss on the cheek was wrong and that she should kiss him on the lips, which she did. A. characterized the kiss as a "peck," meaning it did not involve any touching of the tongues. This pattern repeated itself daily. Sometimes A.'s stepmother was in the room when it happened and sometimes she was not.

During November 2010, A.'s stepmother moved out and only appellant and A. remained at the apartment. A number of times appellant came into A.'s bathroom while she showered and talked to her. The show had a door made of wavy glass that one could see through but not clearly. On one occasion, appellant asked A. is she wanted help washing her back. Both the kissing and shower incidents made A. feel uncomfortable.

3

On another occasion after A.'s stepmother moved out, appellant told A. to go to her room, take off her pants, and lay face down on the bed so he could speak to her. Spanking on the bed was a common way for appellant to punish A. On this particular occasion, however, when appellant entered the room, he told A. to sit up as her bra was not fitting correctly. After telling A. to take off her shirt and bra, he cupped her left breast with his hand and put his thumb on her nipple. He explained that her bra should support her breast and that her nipple was not in the right place. While holding his hand on her breast, appellant kissed A. on the lips. Both her lips and his remained closed. After the kiss appellant pulled back, licked his lips and leaned in to kiss A. again. A. moved back and appellant left the room.

During another incident, A. sat on the couch about one foot away from appellant and the two watched television together. Appellant put his hand on A.'s pelvic area above her vagina but below her waistline and left it there for about one minute. This, like all the incidents A. described, made her uncomfortable.

At the end of December 2010, A. moved in with her mother, because appellant moved to Taiwan.

Before and around the time of the incidents, A. had "googled" her father's name and saw his name and photograph on a registered sex offender Web site. At the time, she did not believe it was actually him because she did not believe that he could have done anything to warrant being on that list.

After the various incidents with her father happened, A. did not tell anyone what happened. Even when a social worker came to her house in December 2010, the month

4

after some of the incidents occurred, to inquire if anyone had touched her inappropriately, A. told the social worker that nothing had happened. A. did not disclose the information until August 2011 when she spoke with her mother about what had happened.

## DISCUSSION

Woods contends the trial court abused its discretion in allowing propensity evidence regarding prior sexual acts committed by him against A.P. and Amelia, because the prior acts were remote in time and lacked sufficient similarity. Additionally, he contends the court's jury instruction on the use of the propensity evidence denied him due process.

## I

### *EVIDENCE CODE SECTION 1108*

#### A. Background

After extensive in limine motions, the trial court allowed the prosecution to introduce limited evidence of sexual behavior of Woods with two teenaged women. We begin with a summary of their testimony.

#### Amelia F.

In 1988, Amelia was in the seventh grade. Woods was her substitute math teacher. Woods began tutoring Amelia, after receiving her grandmother's permission. The tutoring was done at the grandmother's house.

Woods used the dining room table for the tutoring sessions. During one of those sessions, Woods placed his hand on Amelia's left thigh until she moved away.

5

One day when Amelia was walking home from school, Woods drove up next to her and offered her a ride home. After she got into his car, Woods asked her about her shirt size. She said she was not sure, so Woods looked into the back portion of her shirt.

Amelia and Woods began spending more time together. Amelia would often skip school and meet Woods at a designated spot. They went to a mall or a movie together. Amelia testified that every time they met between January and April 1988, they French-kissed. At times while Woods drove he would place his hand on Amelia's thighs and vagina.

On one occasion, Woods asked Amelia to lower her pants so he could determine her pants size. She did so, and he rubbed her thighs and vagina. Amelia said this type of fondling occurred every time she skipped school and went with Woods.

Amelia testified Woods did not force her to skip school or engage in any of the acts. She said she thought they were in a dating relationship. She and Woods were married when she was 15. They were divorced when she was 19 or 20. Amelia was aware that Woods had been charged with offenses and pleaded guilty.

### A.P.

A.P. was Woods's older daughter. He first began molesting her when she was between 10 and 12. One night she stayed overnight at his house. That night he fondled her breasts and touched her between her legs.

When A.P. was in the eighth grade Woods called her into the bedroom for punishment. He made her take down her pants and lie on the bed so he could spank her.

6

After the spanking, Woods had A.P. get into the bed. Woods then got on top of her and made "grinding" motions between her legs against her pelvic area, simulating sexual intercourse. He also kissed her and fondled her breasts. The practice of simulating intercourse with A.P. and kissing her and fondling her breasts continued from time to time until her sixteenth birthday. At that time Woods took A.P. on a ski trip, although she did not ski and did not want to go.

After they arrived at their cabin, A.P. got undressed and went to bed. Woods entered the bedroom wearing only his underwear. Once again he got on top of her, simulated sex, kissed her and fondled her breasts. Woods told her the reason he was doing that was because he was still in love with her mother and A.P. reminded him of her. He told A.P. if she did not like it he would stop. When A.P. asked him to stop, Woods became upset and told her to go sleep on the couch in the living room.

## B. Legal Principles

Section 1108[3] allows the admission of uncharged sexual acts to show the defendant's propensity to commit sexual offenses. The section is a significant departure from the general rule that evidence of propensity to commit crime is not admissible. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159-1160.) The admissibility of such evidence is dependent on the trial court's review of the proposed testimony in light of

---

[3] Section 1108, subdivision (a) provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

7

section 352 to weigh its probative value against its prejudicial effect. (*People v. Loy* (2011) 52 Cal.4th 46, 62; *People v. Falsetta* (1999) 21 Cal.4th 903, 917 (*Falsetta*).) We review rulings on the admissibility of section 1108 evidence under the abuse of discretion standard. We will not overturn such decision absent a clear showing the trial court's actions were unreasonable or arbitrary. (*People v. Lewis* (2009) 46 Cal.4th 1255, 1286; *People v. Robertson* (2012) 208 Cal.App.4th 965, 991.)

In determining whether to admit sex offense evidence there are a number of relevant factors, identified by case law, that a trial court should consider, including: the nature of the acts; relevance to the current issues; remoteness; degree of certainty of the commission; the likelihood of misleading or confusing jurors or distracting them from the principal inquiry regarding the charged offense[s]; the similarity of the acts to the current offense; potential prejudicial impact on jurors; the burden placed on the defendant's ability to defend and the availability of less prejudicial alternatives to admission of the sex offense evidence. (*Falsetta, supra*, 21 Cal.4th at p. 917)

Woods argues that section 1108 violates due process. He recognizes that our Supreme Court has determined otherwise in *Falsetta, supra,* 21 Cal.4th 903, and that this court must follow the high court's decision. He principally raises the due process issue to preserve it for possible federal review.

With regard to the issue of remoteness, no definitive time period has been established by the courts. On the far end of the timeline, *People v. Robertson, supra*, 208 Cal.App.4th 965 at pages 992 to 993, approved of the admission of prior acts which occurred 34 years before the trial. *People v. Branch* (2001) 91 Cal.App.4th 274, 284,

8

upheld the admission of acts occurring 30 years before the charged crimes. ( See *People v. Waples* (2000) 79 Cal.App.4th 1389, 1393, 1395 [18 to 25 years]; *People v. Soto* (1998) 64 Cal.App.4th 966, 977-978, 991-992 [21, 22, and 30 years]). Although there is no fixed timeline for assessing the admissibility of sex offense evidence, remoteness remains a relevant factor. (*Falsetta, supra*, 21 Cal.4th at p. 917.)

## C. Analysis

As we have mentioned, the trial court held a lengthy hearing on the admissibility of the section 1108 evidence. The court recognized its responsibility to apply the section 352 weighing process and did so at some length. The court considered the remoteness of the prior acts, whether they were sufficiently similar, the length of time necessary to present the evidence, as well as questions of relevance and potential prejudice. At the end of the process the court admitted limited testimony from Amelia and A.P.

Woods contends the acts were too remote. The court rejected the argument. The court found the acts were relevant and had sufficient similarity to the acts involving A. that the age of the acts did not diminish their probative value. The court also considered that A.P. and A. were both biological daughters of Woods. Amelia was a young girl who was a student of Woods in a trusting relationship, such that they were relevant to the actions taken by Woods against his other biological daughter, A.

All three girls were in the approximate age group at the start of the molestation. In A.P.'s case she was between 10 and 12 when it began. In Amelia's case, she was 14 and in the case of A., she was 12. In each instance the girls were in trusting relationships

9

with Woods, who appeared to have taken advantage of those relationships to begin and carry on his molestation.

While there are some dissimilarities as to the various acts performed on the three girls, there are also marked similarities, aside from the age and trusting relationships. Both A.P. and A. were punished by being required to lie on the bed, face down, with their pants and underwear removed for spanking. After spanking both girls acts of molestation occurred.

With regard to Amelia and A., in both cases Woods used the excuse of examining their garments to begin his sexual action. With A., she was made to remove her brassiere so Woods could inspect the fit. That led to fondling her breast for several minutes. With regard to Amelia, Woods looked down the back of her shirt to allegedly determine her shirt size. Later he had her remove her pants for the same reason. The latter incident lead to fondling her thighs and vagina.

Finally, Woods argues the jury might have felt the need to punish Woods for the prior acts for which he was not then being prosecuted. However, defense counsel elicited testimony that Woods had "gone to court" and admitted an offense involving Amelia. Counsel also elicited testimony that both A.P. and A. were aware that Woods was a registered sex offender. On this record, we do not believe there was any undue risk the jury would want to "punish" Woods for his past acts. The section 1108 evidence was not significantly more inflammatory that the facts of the charged offenses.

In the final analysis, the question is whether the trial court abused its discretion. This record does not show the court's exercise of decision was unreasonable, arbitrary or

allowed unduly prejudicial evidence. (*Falsetta, supra*, 21 Cal.4th at pp. 916-917. We

find no error in the admission of the challenged evidence.

## II

### *CALCRIM No. 1191*

The trial court instructed the jury with CALCRIM No. 1191,[4] explaining how the

jury should consider the section 1108 evidence. Woods contends the instruction violates

due process.

Once again, appellate counsel recognizes the issue raised has been resolved by our

Supreme Court. Counsel raises the issue here to preserve any remedies Woods may have

in the federal courts.

In *People v. Reliford* (2003) 29 Cal.4th 1007, 1011-1012, the court upheld

CALJIC No. 250.01. The appellate courts have held that CALCRIM No. 1191 is

indistinguishable from the CALJIC version. (*People v. Johnson* (2008) 164 Cal.App.4th

---

4       CALCRIM No. 1191 provides: "The People presented evidence that the defendant committed the crimes that were not charged in this case. These crimes are defined for you in instruction 1110. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offenses. [¶] Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. If the People have not met this burden of proof, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the offenses charged her. [¶] If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of  the offenses charged her. The People must still prove each charge beyond a reasonable doubt. [¶] Do not consider this evidence for any other purpose.

11

731, 739-740; *People v. Wilson* (2008) 166 Cal.App.4th 1034, 1052-1053; *People v. Cromp* (2007) 153 Cal.App.4th 476, 479-480).

Woods does not contend that CALCRIM No. 1191 is distinguishable from CALJIC No. 250.01. He recognizes we are bound to follow our Supreme Court's decision on this issue. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450). We find no error in the use of CALCRIM No. 1191 in this case.

DISPOSITION

The judgment is affirmed.

                                                  HUFFMAN, J.

WE CONCUR:

BENKE, Acting P. J.

IRION, J.