Filed 11/20/24  P. v. Gippson CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DEANDRE LEE GIPPSON,<br><br>        Defendant and Appellant. | A169580<br><br>(San Francisco City and County Super. Ct. No. CRI-23001936) |

Defendant Deandre Gippson stole an iPhone from a woman on the street, and he was charged with grand theft from a person.  A jury convicted him of the charge, and the trial court sentenced him to two years and eight months in prison.

On appeal, Gippson claims there was insufficient evidence that the iPhone was worth more than $950, as required for a felony conviction of grand theft.  He also contends the trial court erred by "refusing to correct the prosecution's misstatement of the law" about the " 'more than $950' value element."  Finally, he claims, and the Attorney General concedes, that a criminal protective order was unauthorized and the abstract of judgment should be amended to remove a fine and two fees the court stayed.

We conclude that there was substantial evidence that the iPhone's fair market value was above $950.  We also conclude that Gippson's claim based on the prosecutor's alleged misstatement of the law is forfeited.  Finally, we

1

accept the Attorney General's concessions, and we strike the protective order and direct that the abstract of judgment be amended to remove the stayed monetary charges. Otherwise, we affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

A.    The iPhone Theft

On the afternoon of February 7, 2023, F.C., a 69-year-old woman, boarded a MUNI bus near the intersection of Geary Boulevard and Divisadero Street. She was holding her iPhone in one hand and her payment card in the other when she felt "someone snatch the phone off [her] hand." She turned around and saw a man, whom she later identified as Gippson, running away while holding the phone.

F.C. got off the bus and began chasing Gippson, "scream[ing] at the top of [her] lungs" about her phone. A nearby Uber driver saw the two run into an apartment complex and drove around to the other side, where Gippson soon emerged. The Uber driver honked at Gippson, who dropped the iPhone and kept running.

As it happened, two police officers were on the other side of the street from where Gippson was running, and the Uber driver honked to get their attention and pointed at Gippson. The officers quickly apprehended him. Meanwhile, the Uber driver got out of his car to retrieve the iPhone. He then returned it to F.C., who had appeared on the scene.

B.    Evidence About the iPhone's Value

The phone taken from F.C. was a 512-gigabyte iPhone 14 Pro. F.C.'s daughter purchased it new as a gift for her. At the time of the crime, F.C. had had it for "about four to five months."

2

When questioned at the scene, F.C. told the reporting officer that she had "no idea" what the iPhone was worth. But at trial, F.C. testified that she researched the model's value before her daughter purchased it, and the approximate cost was $1,400. F.C. later saw the receipt for her phone, which showed that it cost $1,206.12. This figure included a 15 percent discount obtained because a friend of her daughter's who worked for Apple purchased the phone on the daughter's behalf.

The reporting officer testified that sometime during the investigation, she visited Apple's website to look up the price of an iPhone 14 Pro. The officer indicated that the website showed "the starting price" of a "base [iPhone] 14 Pro" was $999. As of trial, about six months after the crime, Apple's website still advertised the iPhone 14 Pro "for the minimum starting price of [$]999."

A lawyer assigned to the research unit of the public defender's office testified for the defense about the iPhone's value. He testified that he performed a "search on eBay for completed sales of an iPhone 14 Pro" with 512 gigabytes of storage. He also limited the search to within 100 miles of the courthouse's zip code. This search returned five results: four sales of new phones, for $890, $900, $910, and $1,049.99, and one sale of a "pre-owned" phone, for $850. None of these values included shipping costs. The five listings showed that Apple was not the direct seller but did not indicate whether the sellers were "authorized dealers."

Finally, another police officer testified in rebuttal that as of that day, the iPhone 14 Pro was still the newest model available for sale on Apple's website. The website did not have any used or refurbished iPhone 14 Pros for sale. The officer also conducted an eBay search for iPhone 14 Pros for sale

within 100 miles of the courthouse's zip code but filtered for authorized sellers, which returned no results.

### C.    *Procedural History*

Gippson was charged with one felony count of grand theft from a person.[1]  It was also alleged that he was on bail when he committed the offense and had suffered a prior strike.[2]  In September 2023, the jury convicted him of grand theft, and the trial court found true the bail and strike allegations.  That December, the court sentenced Gippson to the low term of 16 months in prison, doubled because of the strike, for a total term of two years and eight months.  Sentencing on the bail allegations was stayed.

## II.
### DISCUSSION

### A.    *There Was Substantial Evidence that the iPhone's Fair Market Value Exceeded $950.*

Gippson claims there was insufficient evidence that the iPhone's value was more than $950, as required to convict him of grand theft.  We are not persuaded.

"Theft is divided into two degrees," grand theft and petty theft.  (§ 486.)  Gippson was convicted under section 487, subdivision (c), which provides that grand theft is committed "[w]hen the property is taken from the person of another."  But with exceptions that do not apply here, "[n]otwithstanding Section 487 or any other provision of law defining grand theft, obtaining any property by theft where the value of the . . . personal property taken does not

---

[1] Gippson was charged under Penal Code section 487, subdivision (c).  All further statutory references are to the Penal Code.

[2] The bail allegations were made under section 12022.1, subdivision (b), and the prior-strike allegation was made under sections 667, subdivisions (d) and (e), and 1170.12, subdivisions (b) and (c), based on a 2016 conviction for second degree robbery under section 211.

exceed nine hundred fifty dollars ($950) shall be considered petty theft and shall be punished as a misdemeanor." (§ 490.2, subd. (a).) Thus, to prove that Gippson committed grand theft, "the prosecution bore the burden of proving he stole property valued at more than $950." (*People v. Grant* (2020) 57 Cal.App.5th 323, 328 (*Grant*).)

To determine whether the value of stolen property exceeds $950, the test is "the reasonable and fair market value." (§ 484, subd. (a); *People v. Romanowski* (2017) 2 Cal.5th 903, 914.) In turn, "[t]he fair market value of an item is 'the highest price obtainable in the market place' as between 'a willing buyer and a willing seller, neither of whom is forced to act.' [Citations.] 'Put another way, "fair market value" means the highest price obtainable in the market place rather than the lowest price or the average price.' " (*Grant*, *supra*, 57 Cal.App.5th at p. 329.) "Fair market value may be established by opinion or circumstantial evidence," and "[j]urors may also 'rely on their common knowledge' in determining the value of an item." (*Ibid.*)

In evaluating a claim of insufficient evidence, we consider whether the record contains " 'substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the . . . jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. . . ." A reversal

5

for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

Gippson claims the evidence of the iPhone's value was lacking because the prosecution did not present any evidence of "the market price of a four-to-five-month-old used iPhone 14 Pro with 512 GB," like F.C.'s. Noting that "it is a matter of common sense that a nearly half-year-old used iPhone is not worth as much as a brand-new iPhone," Gippson also faults the prosecution for not presenting "any evidence that would help quantify that depreciation." He argues that "[f]or jurors to conclude that [F.C.'s] phone was worth over $950 at the time of the taking, [they] would have to guess and speculate."

We disagree with Gippson's assessment of the record. There was undisputed evidence that the list price of F.C.'s iPhone when purchased was $1,400. Taking depreciation into account, the jury could reasonably infer that four to five months later, the " '*highest* price obtainable in the market place' " for the used phone exceeded $950—particularly since it was still the newest model of iPhone available. (*Grant, supra,* 57 Cal.App.5th at p. 329, italics added.) This is true despite the evidence that at the time of the crime, the price of a new iPhone Pro 14 on Apple's website was $999. The reporting officer testified that this figure was the "starting price" for a "base" model, but the record does not reveal whether F.C.'s 512-gigabyte phone was the base model. Thus, the jury was not required to calculate depreciation based on the $999 figure.

In addition, although the defense's eBay evidence may have shown it was *possible* to purchase a used 512-gigabyte iPhone 14 Pro for less than $950, the jury was hardly required to conclude that the $850 value of one sale was the ceiling for such a transaction. Nor does Gippson cite any authority

6

indicating that the prosecution had to produce its own direct evidence of the market value of a used iPhone exactly like F.C.'s. As this case demonstrates, it will often be difficult to precisely assess the value of a used consumer good, but the lack of a market for comparable items did not preclude the jury from reasonably concluding that the iPhone was worth more than $950.

B.     *Gippson's Claim Involving the Prosecutor's Alleged Misstatement of the Law Is Forfeited.*

Gippson also claims the trial court violated his rights to due process and a fair trial "by repeatedly refusing to correct the prosecution's misstatement of the law" that the fair market value of the iPhone was its "replacement cost." This claim fails.

1.     Additional facts

The jury was instructed under CALCRIM No. 1801 that in determining whether stolen property is worth more than $950, the property's "value . . . is the fair market value of the property. [¶] Fair market value is the highest price the property would reasonably have been sold for in the open market at the time of, and in the general location of, the theft."

In closing, the prosecutor explained the element of "the value of the property [being] more than $950" as follows: "So the easiest way to think about this element is what would be the cost[] of the phone if the phone had been destroyed and the victim had to buy a new phone." The trial court overruled Gippson's objection that this misstated the law.

Gippson's claim also involves the trial court's responses to two notes the jury submitted about the iPhone's value. The first note, after quoting CALCRIM No. 1801's statement that " '[f]air market value is the highest price the property would reasonably have been sold for in the open market,' " asked, "[D]oes that mean the cost to replace the phone with a similar one?— OR—'the price <u>her</u> phone would sell for?' " The trial court answered, "[T]he

7

latter—her phone."  This answer echoed Gippson's proposal that the court answer, "[T]he fair market value is the highest price the property (her phone) would reasonably have sold for in the open market."

The second note at issue stated, "The prosecutor mentioned case law that the 'value' could be 'the replacement cost.' [¶] CAN WE ASK ABOUT THAT CASE LAW?"  The trial court answered, "Please refer to the response to [the previous] question.  Also, if you believe the attorneys' comments on the law conflict with my instructions, you must follow my instructions."  Again, this answer incorporated Gippson's proposed answer, which was, "If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

### 2. Gippson's claim is forfeited.

Gippson's claim is that "[t]he trial court prejudicially abused its discretion, in violation of [his] constitutional right to due process and a fair trial, by repeatedly refusing to correct the prosecution's misstatement of the law that replacement cost is fair market value."  This argument appears to combine two distinct types of claims, prosecutorial error and instructional error.  But Gippson does not discuss any decisions relating to either type of claim.  Rather, the only authorities he cites, other than decisions addressing grand theft's value element, are federal and state constitutional provisions guaranteeing due process and a fair trial.  This is insufficient to establish the legal basis for his claim, which we therefore conclude is forfeited.  (See *Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, 629–630.)

Even if we considered the claim under the rubrics of prosecutorial error and instructional error, we would conclude that it was forfeited.  To preserve a claim of prosecutorial error for appeal, " 'a criminal defendant must make a

8

timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety,' " unless an admonition "would have been futile . . . or . . . would not have cured the harm." (*People v. Clark* (2011) 52 Cal.4th 856, 960.) Although Gippson's trial counsel objected to the challenged statement of the law, he did not request an admonition. Nor does Gippson attempt to demonstrate that an admonition would have been ineffective. Indeed, a basic premise of his claim is that the trial court could have corrected the prosecutor's alleged misstatement by "inform[ing] the jury that replacement cost is not fair market value."

To the extent Gippson argues the trial court committed instructional error based on its responses to the jury's notes, we conclude that he also forfeited this aspect of the claim by failing to object below. " 'When the trial court responds to a question from a deliberating jury with a generally correct and pertinent statement of the law, a party who believes the court's response should be modified or clarified must make a contemporaneous request to that effect; failure to object to the trial court's wording or to request clarification results in forfeiture of the claim on appeal.' " (*People v. Boyce* (2014) 59 Cal.4th 672, 699.) Gippson does not contend that the court's responses to the two notes were legally incorrect in and of themselves. Rather, he claims the court should have used the notes as an opportunity "to inform the jury that replacement cost is not equivalent to fair market value." But Gippson did not ask the court to include any such language in responding to the notes, and both responses included the language he *did* request. Therefore, this aspect of his claim is also forfeited.

Finally, even if we considered Gippson's claim on the merits, we would reject it. Assuming, without deciding, that the prosecutor improperly argued that replacement cost was an appropriate measure of the iPhone's fair

9

market value, we conclude the trial court's answers to the jury's notes plainly corrected the misstatement. The first note asked whether " 'the highest price the property would reasonably have been sold for in the open market' " meant "the *cost to replace* the phone with a similar one" or "the price [F.C.'s] phone would [have sold] for," and the trial court answered, "[T]he latter—her phone." (Italics added.) Thus, the court informed the jury that fair market value was the market value of F.C.'s phone, not its replacement cost. The court's response to the second note further enforced this principle, by referring the jury to its previous response when the jury asked about case law supporting the prosecutor's "replacement value" argument.

Gippson does not explain why these responses were inadequate, except to insist that the trial court should have explicitly stated that "replacement cost is not equivalent to fair market value." But we think the court's responses effectively conveyed this idea, and we conclude that his claim fails for this reason as well.

C.      *The Protective Order Was Unauthorized.*

Next, Gippson claims, and the Attorney General concedes, that a criminal protective order entered as part of the sentence was unauthorized and must be stricken. We agree.

The probation report recommended that Gippson be ordered to stay away from F.C. At sentencing, Gippson's trial counsel stated he "was wondering [about] the legality of a stay away order" but did not formally object. The trial court then entered a protective order prohibiting Gippson from coming within 150 yards of F.C. or contacting her through a third party other than an attorney of record. The form order the court used, Judicial Council form No. CR-161, is titled "CRIMINAL PROTECTIVE ORDER—

10

OTHER THAN DOMESTIC VIOLENCE" and provides that it may be issued under sections 136.2, 136.2, subdivision (i)(1), or 646.9, subdivision (k).

We address the merits of this issue despite Gippson's arguable failure to raise it below, because " '[a] claim that a sentence is unauthorized . . . may be raised for the first time on appeal, and is subject to judicial correction whenever the error comes to the attention of the reviewing court.' " (*People v. Robertson* (2012) 208 Cal.App.4th 965, 995.) As we now discuss, none of the three potential statutory bases for the challenged order authorized it.

Under section 136.2, subdivision (a), a trial court may issue a protective order in a criminal case "[u]pon a good cause belief that harm to, or intimidation or dissuasion of, a victim or witness has occurred or is reasonably likely to occur." It is settled that this provision "authorize[s] imposition of protective orders only during the pendency of the criminal action. [Citations.] Thus, once the defendant is found guilty and sentenced, the court's authority to issue a protective order under section 136.2, subdivision (a)[,] generally ceases." (*People v. Beckemeyer* (2015) 238 Cal.App.4th 461, 465.) Since the order at issue was entered after Gippson was convicted, it was not generally authorized under section 136.2.

Section 136.2, subdivision (i), "create[s] an exception to the preconviction limitation of a section 136.2 restraining order for *domestic violence* cases" (*People v. Beckemeyer*, *supra*, 238 Cal.App.4th at p. 465), but Gippson was not convicted of a domestic violence offense. Similarly, section 646.9, subdivision (k), authorizes a postconviction restraining order to protect a victim of stalking, but this provision clearly does not apply to Gippson either. In short, there was no statutory authority for the protective order, and it must be stricken. (*People v. Robertson*, *supra*, 208 Cal.App.4th at p. 996.)

11

*D.*   *The Abstract of Judgment Shall Be Amended to Remove the Stayed Fine and Fees.*

At sentencing, the trial court imposed a restitution fine of $300, a court operations fee of $40, and a conviction fee of $30, but stayed all three charges under *People v. Dueñas* (2019) 30 Cal.App.5th 1157.  The abstract of judgment reflects these charges, although it also states, "Fines and fees suspended."  We agree with the parties that to avoid confusion, the abstract should be amended to remove these charges.

III.
DISPOSITION

The criminal protective order entered at sentencing is stricken.  The trial court is directed to amend the abstract of judgment to remove the stayed fine and fees and ensure that a certified copy of the amended abstract is sent to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

12

_____
Humes, P. J.

WE CONCUR:


_____
Banke, J.



_____
Hill, J.*

*Judge of the Superior Court of the County of San Mateo, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*People v. Gippson*  A169580

13